**Joseph A. O'KEEFE, Plaintiff,**

v.

**MERCEDES–BENZ USA, LLC, Defendant.**

Civil Action Nos. 01–CV–2902, 03–CV–1480.

United States District Court, E.D. Pennsylvania.

April 2, 2003.

---

Arlin M. Adams, Schnader, Harrison, Segal & Lewis, Philadelphia, PA, Francis J. Farina, Devon, PA, Kenneth A. Jacobsen, Media, PA, Peter A. Lennon, Kaplan, Fox & Kilsheimer LLP, Broomall, PA, Arthur R. Miller, Cambridge, MA, for Plaintiff.

Keith D. Heinold, Marshall, Dennehey, Warner, Lewis H. Goldfarb, Hogan & Hartson, LLP, New York City, Terri Steinhaus Reiskin, Jonathan T. Rees, Hogan and Hartson, L.L.P., Washington, DC, for Defendant.

Joseph P. Grimes, Grimes & Grimes, LLC, Cherry Hill, NJ, Perry G. Shuttlesworth, Jackson & Shuttlesworth, PC, Birmingham, AL, Ralph J. Bellafatto, Ralph J. Bellafatto, PC, Easton, PA, John Quincey Somerville, Galloway & Somerville LLC, Birmingham, AL, for Objector.

Perry G. Shuttlesworth, Jr., Shuttlesworth & Moore, Birmingham, AL, pro se.

### OPINION AND ORDER

VAN ANTWERPEN, District Judge.

This class action case has been brought to settlement within just sixteen months due to the hard work and skill of both Plaintiff and Defense counsels. Presently before this court is Plaintiff and Defendant's Joint Motion for Approval of the Proposed Settlement filed on November 11, 2002. We held a settlement hearing on December 20, 2002. Arguments were heard from Plaintiff's counsel, Defendant's counsel and several attorneys representing various objectors. Over one-hundred docket entries have been submitted since the Joint Motion for Approval of the Proposed Settlement was filed in August 2002. This Memorandum and Order will certify the proposed settlement class, approve the settlement and set the attorney's fees. None of objectors' arguments have altered the certification process, the settlement or the attorney's fees award. Although it can be helpful to have opposing counsel probe the issues, the objectors in this case have only succeeded in lengthening our memorandum and unnecessarily requiring class counsel and

the Defendant to expend additional resources.

## I. Background & Procedural History

On May 4, 2001, Plaintiff Joseph A. O'Keefe filed a class action suit against Mercedes–Benz USA, LLC ("MBUSA") in the Court of Common Pleas for Philadelphia County, Pennsylvania. The complaint alleged violation of the Pennsylvania's Unfair Trade Practices and Consumer Protection Laws, 73 P.S. § 201–1 ("UTPCPL"), breach of express and implied warranties, fraudulent concealment and declaratory relief on behalf of a class of all persons in the Commonwealth of Pennsylvania who purchased or leased 1998 or 1999 model year Mercedes–Benz vehicles equipped with a Flexible Service System ("FSS"). Plaintiff claimed that MBUSA failed to disclose that vehicles equipped with FSS would "evidence premature and/or bearings wear, and other internal defects." *See* Def.'s Notice of Removal filed on June 12, 2001: Ex. 2 at 2 (May 4, 2001).

On June 12, 2001 the case was removed to this court based upon diversity of citizenship. After removal, Plaintiff amended his complaint pursuant to our December 17, 2001 Order. The complaint added a claim under the Magnuson–Moss Warranty Act and expanded the proposed class to include all persons throughout the United States who purchased or leased 1998 or 1999 Mercedes–Benz vehicles equipped with the FSS. In January 2002, we dismissed Plaintiff's newly added Magnuson–Moss Warranty Act claim without prejudice because we lacked subject matter jurisdiction pursuant to 15 U.S.C. § 2310(d)(3)(C). *See O'Keefe v. Mercedes–Benz USA, LLC,* No. 01–CV–2902, 2002 WL 377122 (E.D.Pa. Jan.31, 2002). Section 2310(d)(3)(C) prohibits class actions under Magnuson–Moss in federal court when there are less than 100 named plaintiffs. *Id.* at *4.

Plaintiff filed a Second Amended Class Action Complaint on July 23, 2002. As the case stands now, Plaintiff's complaint contains four counts against MBUSA: (1) violation of various state consumer protection statutes; (2) breach of express warranty; (3) breach of implied warranty; and (4) unjust enrichment. The complaint alleges that MBUSA made intentional misrepresentations as part of a fraudulent scheme. Plaintiff seeks actual damages, reasonable attorney's fees, punitive or treble damages and any other relief that the Court deems appropriate. More importantly, the Second Amended Complaint altered the proposed class to include "[a]ll persons throughout the United States (including Puerto Rico and U.S. territories) who own or lease a model year 1998, 1999, 2000 or 2001 (first purchased or leased before March 31, 2001) Mercedes–Benz vehicle equipped with the FSS." *See* Pl.'s Second Amended Class Action Complaint at ¶ 9 filed on July 23, 2002. To date, we have not ruled on our subject matter jurisdiction over the newly proposed class.

The Second Amended Class Action Complaint alleges that:

> [t]hrough a common and uniform course of conduct utilizing common documents, defendant manufactured, supplied, promoted, sold and leased vehicles when it knew or should have known that its vehicles equipped with the FSS would experience premature and/or abnormal rod bearings wear, excessive oil consumption, sludge buildup, and other internal defects, if the FSS oil service intervals recommended by defendant utilizing Mercedes–Benz approved conventional motor oils were strictly followed by the owners and lessees of the vehicles.

Second Am. Compl. at ¶ 2.

The FSS monitors the car's driving conditions. It then determines when the vehicle requires an oil change. A dashboard panel indicator lights up to inform the driver that a service is needed. The alleged problem occurs when the driver uses conventional oil instead of synthetic oil with the FSS system. Typically the FSS recommends oil changes somewhere between 10,000 and 20,000 miles with a 12,000 mile average depending on each vehicle's operation and driving conditions. Allegedly, conventional oil will cause engine damage when used for FSS recommended drain intervals. In March 2001, MBUSA sent all vehicle owners a letter that strongly recommended switching over to pure synthetic oils for all FSS equipped vehicles to prevent excessive oil consumption and oil sludging.

The parties reached a settlement and submitted it for approval in August 2002. Un-

der the terms of the agreement, MBUSA has agreed to provide the class with three main benefits. First, MBUSA will give the owners and lessees of 1998 and 1999 Maintenance Service Certificates which will entitle class members to a thirty-five dollar discount off a scheduled service which includes an oil change. *See* Global Class Action Settlement Agreement, at ¶ 12. Owners and lessees of 2000 and 2001 vehicles will not receive the certificates because these class members are still covered by MBUSA's Maintenance Program whereby MBUSA bears the cost of routine maintenance. *See* Pl.'s Mem. of Law in Support, at 6 filed on Aug. 7, 2002 [61–1]. The voucher is tied to the each vehicle's Vehicle Identification Number ("VIN") and can be transferred to its subsequent owners or lessees. The vouchers expire in December 2004. *See* Parties' Joint Motion for Preliminary Approval, at 9–10 filed Aug. 7, 2002 [60–1] [hereinafter "Joint Approval"]. O'Keefe and MBUSA agree that the vouchers are worth $12.3 million to the class. *See* Def.'s Post–Hearing Br., at 23, filed Feb. 5, 2002[150–1]; Pl.'s Post–Hearing Br., at 48, filed Jan. 22, 2003 [144–1].

Second, MBUSA will provide a unique warranty that "will cover engine damage caused by use of API SH or SJ conventional motor oil" in the FSS equipped vehicles. The warranties, like the vouchers, are tied to the vehicle and are transferable. The warranty coverage will apply up to 10 years or 150,000 miles. *See* Joint Approval at 8–9. O'Keefe claims that this is a limited "extended warranty." *See* Pl.'s Proposed Findings of Fact, at 12, filed Jan. 22, 2003 [143–1]. MBUSA labels the warranty a "coverage program." *See* Def.'s Proposed Findings of Fact, at 9–10, filed Feb. 5, 2002 [149–1]. Whatever the label, the Extended Warranty Coverage Program only covers damage associated with the allegedly defective FSS system caused by using conventional motor oil instead of synthetic motor oil.

Third, MBUSA has agreed pay to certain litigation expenses that are normally borne by the class in Rule 23(b)(3) class actions. MBUSA agreed to pay class counsel reasonable court awarded attorney's fees and not appeal any fee award under $7.5 million. *See* Joint Approval at 14–15. Additionally, MBUSA paid for the printing and initial mailing of notifications to the class members. It also paid for the re-mailing that was necessitated by a database error was discovered. *See* Pl.'s Proposed Findings of Fact, at 14–15.

In exchange, the class has released MBUSA from most but not all claims. It states as follows:

> [A]ll Class members who do not opt out of the proposed Settlement Class, ..., hereby releases and forever discharges MBUSA from any and all claims, demands, causes of action of eery kind nature, obligations, damages, losses and costs, whether known or unknown, actual or potential, suspected or unsuspected, contingent or fixed, that were or could have been asserted or sought in the Actions, relating to the use of conventional motor oil in Vehicles equipped with the FSS, including, but not limited to, claims for negligence, strict liability, breach of express or implied warranty, and violation of state consumer protection or deceptive trade practices statutes.

Joint Approval, at 13–14. The release is not a general release because it does not release personal injury claims.[1] The parties doubt that any personal injuries would result because the type of potential damage in this case is unrelated to vehicle safety. We discussed this topic when we denied Plaintiff's motion for a preliminary injunction. *See* *O'Keefe*, 2002 WL 377122, at *2–4. We found it unlikely that irreparable harm would result because the alleged defect was not a safety concern. *Id.* at *3. We also found that public

---

1. At the December 20, 2002 oral argument, class counsel and defense counsel stated that the release did not release MBUSA from personal injury claims. *See* Trans. of Dec. 20, 2002, at 215–17 [141–1]. The parties had specifically discussed the topic during negotiations and documented this limit on the release. *See* Notice of Filing Correspondence: Letter from Reiskin to Jacobsen of 7/19/02 filed Feb. 4, 2003 [148–1] ("In the spirit of accommodation, however, this is to confirm that in the extremely unlikely event of any future claims of personal injury due to engine problems relating to the use of conventional oil with FSS in the 1998–2001 (sold before March 3, 2001) vehicles, MBUSA will not invoke the release in the class action Settlement Agreement as a defense to such claims.").

interest considerations did not weigh in favor of an injunction because the alleged defect did not pose a safety problem to vehicle occupants or the public. *Id.* at *4.

This court held a Settlement Hearing on December 20, 2002 which included: (1) Plaintiff's counsel; (2) Defendant's counsel; (3) counsel for Objectors Ronald Pitts, Sandra Pitts, Shoals Provision and Horace Connor (collectively "Pitts"); [2] (4) counsel for Objector Nicole Yatooma; and (5) counsel for Objectors Arthur Haberberger, Joanne Haberberger, David Irmer and Martha Irmer (collectively "Haberbergers"). The oral arguments covered both the proposed settlement and the petition for attorney's fees.

After receiving and reviewing the post-hearing briefs, we sought additional argument and briefing on the issue of subject matter jurisdiction. Pursuant to our February 14, 2003 Order, oral argument regarding subject matter jurisdiction was heard on February 20, 2003 from: (1) Plaintiff's counsel; (2) Defendant's counsel; and (3) counsel for Objectors Pitts.

**2.** MBUSA maintains that Ronald Pitts, Sandra Pitts and Shoals Provision should be treated as one objector because it appears they jointly own one vehicle. *See* Def.'s Post–Hearing Br., at 14 n. 1 filed on Feb. 5, 2003 [150–1]. Also, the Pitts' counsel John Q. Somerville is a member of the class and he made reference to his own personal objections to the settlement in his presentations to the court. We consider him to be both a Pitt objector and counsel for the Pitts.

**3.** Even if the Magnuson–Moss claim does not create subject matter jurisdiction, we believe that the New Jersey Consumer Fraud Act ("NJCFA"), N.J. Stat. §§ 56:8–1–:8–116 (2002), may apply to the claims of each class member under Pennsylvania's choice of law rules. The NJCFA provides for legal and equitable relief plus treble damages in private actions. *See* N.J. Stat. §§ 56:8–19 (2002). Each member of the proposed class would exceed § 1332's $75,000 threshold and we would clearly have subject matter jurisdiction over the action.

The parties maintain that the choice of law inquiry is unrelated to subject matter jurisdiction. We disagree. If the choice of law inquiry leads us to a choice of state law where there is a legal certainty that the jurisdictional threshold would not be met, then there is no jurisdiction.

A federal court sitting in diversity applies the choice of law principles of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Port Authority of New York and New Jersey v. Arcadian Corp.,* 189 F.3d 305, 311 (3d.

## II. JURISDICTION

We have subject matter jurisdiction over the proposed class's claims. This court has spent a considerable amount of time on this issue because we are a court of limited jurisdiction that has a duty to question whether our subject matter jurisdiction has been properly invoked. The February 20, 2003 oral argument and the accompanying briefs sufficiently resolved our concerns.

█ Plaintiff has put forth four alternative theories supporting our subject matter jurisdiction over the class member's claims. First, O'Keefe argues that subject matter jurisdiction exists because it existed at the time of removal. We agree in part. Second, O'Keefe claims to have perfected the Magnuson–Moss class action and it is now properly within our jurisdiction. We disagree and will remand the Magnuson–Moss class action. Third, jurisdiction exists because each class member is asserting a claim under the New Jersey Consumer Fraud Act.[3] We decline to

Cir.1999). Pennsylvania has long since abandoned the *lex loci delicti* rule to determine choice of law. *See Griffith v. United Air Lines, Inc.,* 416 Pa. 1, 21–22, 203 A.2d 796, 805–06 (1964) ("[W]e are of the opinion that the strict *lex loci delicti* rule should be abandoned in Pennsylvania in favor of a more flexible rule which permits analysis of the policies and interests underlying the particular issue before the court."). The Pennsylvania Supreme Court has summarized its choice of law rules as follows:

This Court in *Griffith v. United Air Lines, Inc.,* held that in resolving a potential conflict between the application of state laws we must consider the policies and interest underlying the particular issue before the court. *Id.* 203 A.2d at 805. As further explained in *McSwain v. McSwain,* 420 Pa. 86, 215 A.2d 677 (1966), we must analyze the:

extent to which one state rather than another has demonstrated, by reason of its policies and their connection and relevance to the matter in dispute, a priority of interest in the application of its rule of law.

*Id.* 215 A.2d at 682. Furthermore, in evaluating the interests of one jurisdiction over another, we must view the factors qualitatively as opposed to quantitatively, *Cipolla v. Shaposka,* 439 Pa. 563, 267 A.2d 854 (1970).

*Myers v. Com. Union Assur. Co.,* 506 Pa. 492, 485 A.2d 1113, 1115–16 (1984). We have little doubt that New Jersey law would govern the claims brought by all members of plaintiff's class because New Jersey is where the alleged misconduct and fraudulent concealment took place and

conduct a full choice of law analysis at this time because the parties have agreed to settle the case to avoid the potential risks such a decision might mean for both sides. *See Gunter v. Ridgewood Energy Corp.*, 164 F.R.D. 391, 399 (D.N.J.1996) (stating that choice of law issues were premature and did not prevent class certification). Fourth, O'Keefe argues that jurisdiction may be founded upon the class member's common law claims for unjust enrichment and fraud pursuant to 28 U.S.C. § 1332.[4] We agree. We have supplemental jurisdiction over each proposed class member's state consumer protection and deceptive trade practices act pursuant to 28 U.S.C. § 1367(a) because they form part of the same case and controversy as the common law consumer unjust enrichment and fraud claims.

### A. Removal and Subject Matter Jurisdiction in General

Any civil action brought in state court may be removed by the defendant to the federal district court in the district where such action is pending, if the district court would have original jurisdiction over the matter. *See* 28 U.S.C. 1441(a); *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 7–8, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983); *U.S. Express Lines Ltd.*

---

where the alleged deceptive statements originated. It is where the bulk of discovery was conducted. MBUSA has its principle place of business in New Jersey. New Jersey has a policy interest in regulating its resident corporations. It may be proper to apply the New Jersey Consumer Fraud Act.

This same approach was taken in several cases. *See, e.g., Weiss v. Mercedes–Benz of N. Am., Inc.*, 899 F.Supp. 1297 (D.N.J.1995) (applying the NJCFA to a nationwide class action when defendant was a New Jersey resident); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 248 n. 15 (D.Del.2002) (applying the Delaware Consumer Fraud Act to all claims when state laws do not material differ and defendant's deceptive conduct "arose, was directed and emanated from Delaware ...") (citing *In re Cordis Corp. Pacemaker Prod. Liab. Litig.*, No. C–3–86–543, 1992 WL 754061, at *13 (S.D.Ohio Dec.23, 1992) (noting that it is proper under Supreme Court precedent to apply a particular state's laws in a nationwide class action if the defendant's headquarters are in that state and many of the acts upon which liability is predicated took place there)); *Peterson v. BASF*, 618 N.W.2d 821, 822–23 (Minn.App.2000) (applying the NJCFA because defendant was headquartered in New Jersey).

At this time, we do not hold that New Jersey law controls in this case for the entire nationwide class. Plaintiff originally added the NJCFA claim in his first Amended Complaint filed on December 19, 2001. *See* Am. Class Compl. at ¶¶ 48–54 [30–1]. Plaintiff fully briefed this claim in his memorandum filed in response to our February 14, 2003 Order requiring further oral arguments and briefing on subject matter jurisdiction. *See* Pl.'s Supplemental Mem. in Supp. of Subject Matter Jurisdiction, at 4–16 [157–1]. Defendant stated its opposition to the claim at the December 20, 2002 and February 20, 2003 oral arguments and filed a thorough and convincing brief. *See* Def.'s Response to Pl.'s Supp. Memo. filed Mar. 7, 2003 [168–1]. Defendant cites numerous opinions from the district and appellate courts in the Second, Fifth, Sixth and Seventh Circuits that have refused to apply the

state law of the defendant's headquarters to the claims of a nationwide class action. *Id.* at 2–6. Defendant further argues that a full choice of law analysis was not carried out by the court in the opinions cited by Plaintiff. We agree with Defendants in so far as a full choice of law analysis is premature and unnecessary because this case is being settled in part to avoid further litigation expenses and risks.

This claim is still in dispute between the parties. We decline to rule on jurisdiction based on the potential NJCFA claims until the case proceeds towards trial—if indeed a trial even becomes necessary. Any jurisdictional problem relating to state statutory consumer protection law, as discussed *infra* Section II.B.2., may be cured after a full choice of law analysis before trial. *See In re School Asbestos Litig.*, 921 F.2d 1310, 1315–16 (3d Cir.1990) (stating that FED.R.CIV.P. 12(d) & 12¶) does not require a prompt determination on jurisdiction when: "(1) it is not clear that the district court lacks jurisdiction over the subject matter, and (2) a court does not have to dismiss a claim if the jurisdictional failure can be cured." (citations omitted). At this time, we cannot say that we lack jurisdiction over the case if the NJCFA applies to all claims. It suffices to say that this issue is contentious.

4. MBUSA stated at oral argument that "there are no fraud claims here" because the parties believed that class certification would be complicated. Tr. of Dec. 20, 2002, Settlement Hearing, at 190–191. Yet, the parties discuss class certification as if the fraud claims are still in the case. That is precisely because fraud claims are one of the main causes of action. State consumer protection and deceptive trade practice acts are derived from common law fraud. The Pennsylvania law that was the basis of O'Keefe's state suit requires reliance. *See Weinberg v. Sun Co., Inc.*, 565 Pa. 612, 777 A.2d 442, 445–46 (2001) (requiring reliance). As discussed *infra* Section III. B.1., individual issues of reliance are not a bar to class certification in this case because common issues predominate.

v. Higgins, 281 F.3d 383, 388–89 (3d Cir. 2002). Where removal is based on diversity jurisdiction, the matter must be a case which the federal courts would have had original jurisdiction under 28 U.S.C. § 1332. Diversity jurisdiction is properly invoked in cases where there is complete diversity of citizenship between plaintiffs and defendants and where the amount in controversy exceeds $75,000. See 28 U.S.C. § 1332. See Development Fin. Corp. v. Alpha Housing & Health Care, Inc., 54 F.3d 156, 158 (3d Cir. 1995) ("It is axiomatic that the federal judiciary's diversity jurisdiction depends on complete diversity between all plaintiffs and all defendants.") (citing Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806)).

### 1. Removal Was Proper for O'Keefe's Claims

■ We have subject matter jurisdiction over O'Keefe's claim pursuant to § 1332. This action was removed from the Philadelphia County Court of Common Pleas pursuant to 28 U.S.C. § 1441(a). Removal was proper. Subject matter jurisdiction existed at the time of removal because O'Keefe and MBUSA were diverse and there was more than $75,000 in controversy. O'Keefe resides in Fleetwood, Pennsylvania and is a citizen of Pennsylvania. Mercedes–Benz is incorporated in Delaware with its principle place of business in Montvale, New Jersey. Under Pennsylvania's UTPCPL, O'Keefe's may seek damages equal to treble the purchase price of his vehicle. O'Keefe's vehicle cost $34,950.00, which equals $137,300.00 when trebled.

### 2. The UTPCPL Allows Consumers to Seek Treble Damages

The UTPCPL states in pertinent part:

**Private Actions.** (a) Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater. *The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper.* The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees.

PA. STAT. ANN. tit. 73 § 201–9.2 (West 2003) (emphasis added). The statute clearly allows the court to award treble damages when the act is violated. The statute places no express limit or control on the court's discretion.

A Third Circuit panel in Werwinski v. Ford Motor Co., 286 F.3d 661 (2002), held that Pennsylvania's common law economic loss doctrine trumped Pennsylvania's statutory consumer protection statute. The panel held that consumers who allege they were intentionally defrauded may only recover actual damages. We cannot follow the panel's decision when it is not in harmony with Pennsylvania state law because: (1) in Pennsylvania common law may not overrule legislative intent and violate a statute; (2) Pennsylvania courts have refused to apply the economic loss doctrine in consumer common law intentional fraud suits; (3) Pennsylvania courts have allowed treble damage awards in consumer fraud cases pursuant to the UTPCPL without reference to the economic loss doctrine; (4) Pennsylvania courts since Werwinski have continued to do so; and (5) the panel based its decision entirely on a U.S. District Court for the Western District of Wisconsin case applying Wisconsin law which is not binding on Pennsylvania courts.

First, Pennsylvania's statutory construction statute clearly bars applying common law doctrine to overturn legislative acts enacted after September 1, 1937. See PA. STAT. ANN. tit. 1 § 1921 ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing the spirit."); PA. STAT. ANN. tit. 1 § 1928(a) ("The rule that statutes in derogation of the common law are to be strictly construed, *shall have no application* to the statutes of this commonwealth ....") (emphasis added); cf. N. Singer, Sutherland Statutory Construction § 50:05

(6th ed. 2000) ("[G]eneral and comprehensive legislation, where course of conduct, parties, things affected, limitations and exceptions are minutely described, indicates a legislative intent that the statute should totally supersede and replace the common law dealing with the subject matter."). The court may not simply ignore part of a statute. *See* Pa. Stat. Ann. tit. 1 § 1922(2) ("In ascertaining the intention of the General Assembly in the enactment of a statute the following presumptions, among others, may be used.... (2) That the General Assembly intends the entire statute to be effective and certain."). The court may not ignore the clear intent of the legislature to allow the court, in its discretion, to award treble damages for violations of the statute. *See Commonwealth v. Sitkin's Junk Co., Inc.,* 412 Pa. 132, 138, 194 A.2d 199 (1963) ("[W]e have repeatedly said in the construction of a statute that presumably every word, sentence and provision therein is intended for some purpose, and accordingly must be given effect."). The common law doctrine of economic loss may not overrule the UTPCPL because the UTPCPL was enacted in December 1968 and the UTPCPL's Private Actions subsection must be given its clear legislative intent.

Second, before the *Werwinski* panel's decision, Pennsylvania's Common Pleas Courts were apparently unanimous in refusing to apply the economic loss doctrine even in common law intentional fraud claims. *See e.g., Oppenheimer v. York Intern.,* No. 4348, 2002 WL 31409949, at *6 (Pa.Comm.Pl. Oct. 25, 2002) ("[T]his Court has not extended the economic loss doctrine to cover intentional torts;" "This court does not believe that intentional misrepresentation and outright dishonesty, if they can indeed be proven, are properly redressed by breach of contract or warranty action."); *Zwiercan v. General Motors Corp.,* No. 3235, 2002 WL 31053838, at *6 (Pa.Comm.Pl. Sept. 11, 2002) ("In declining to extend the application of the economic loss doctrine to intentional fraud claims, this Court noted, there is an absence of Pennsylvania case law on the subject, but found support for the proposition that the doctrine should not bar claims where the representation is intentionally false."); *Worldwideweb Networx Corp. v. Entrade, Inc.,* 2002 WL

1472336, at *3 (Pa.Comm.Pl. June 20, 2002) ("[T]he economic loss doctrine does not apply to intentional tort claims."); *Teledyne Tech. Inc. v. Freedom Forge Corp.,* No. 3398, 2002 WL 748898, at *11 (Pa.Comm.Pl. Apr. 19, 2002) ("[I]f Pennsylvania law were to apply, the economic loss doctrine would not bar the plaintiff's intentional misrepresentation claim."); *Amico v. Radius Communications,* No. 1793, 2001 WL 1807924 (Pa.Comm.Pl. Jan 9, 2001) (holding that economic loss doctrine does not apply to intentional fraud claims); *First Republic Bank v. Brand,* 50 Pa. D. & C. 4th 329, 2000 WL 33394627 (Pa.Comm.Pl. Dec. 19, 2000) (holding that the economic loss doctrine does not apply to fraudulent misrepresentation claim). If the Common Pleas Courts did not apply the common law doctrine of economic loss to common law intentional torts, we do not believe they would have applied it to statutory intentional torts or consumer protection statutes. Pennsylvania's Supreme Courts and appellate courts have not addressed the issue.

Third, before the *Werwinski* panel decision, both of Pennsylvania's appellate courts upheld decisions where a consumer recovered treble damages under the UTPCPL when the consumer suffered only monetary or property damage caused by defendant's misrepresentations or fraudulent scheme. *See Johnson v. Hyundai Motor Am.,* 698 A.2d 631, 637–40 (Pa.Super.Cit.1997) (affirming treble damage award under the UTPCPL when car manufacturer violated warranty; and stating that Pennsylvania courts are not bound by earlier federal court cases that declined to award treble damages after exercising discretion); *see also, e.g., McCauslin v. Reliance Fin. Co.,* 751 A.2d 683, 684 (Pa.Super.Ct.2000) (trebling damages under the UTPCPL for "actual damage sustained" but not emotional distress or attorney's fees in pursuit thereof when finance company accelerated payments); *Baker v. Cambridge Chase Inc.,* 725 A.2d 757, 766–67 (Pa.Super.Ct.1999) (Since plaintiffs "bring their fraud claim under the UTPCPL, they may, therefore, be entitled to treble damages and attorney's fees in addition to restitution," when purchasers of unfinished townhouse brought fraud claim); *Metz v. Quaker Highlands, Inc.,* 714 A.2d 447 (Pa.Super.Ct.1998)

(granting land purchasers rescission and treble damages); *Sewak v. Lockhart,* 699 A.2d 755, 761–63 (Pa.Super.Ct.1997) (affirming treble damage award when seller was found to have fraudulently concealed the fact that a support column was removed from the house); *Hammer v. Nikol,* 659 A.2d 617, 619–20 (Pa.Commw.Ct.1995) (affirming award of double damages and attorney's fees under the UTPCPL when towing company fraudulently failed to disclose true towing and storage fees before customer signed contract). In each of these cases, the plaintiff never alleged personal injury and the court did not require a showing of personal injury. The court never considered applying the economic loss doctrine in these cases.

Fourth, since the *Werwinski* panel decision, Pennsylvania's appellate courts continue to allow treble damages under the UTPCPL even when the plaintiff suffered no personal injury. *See Conner v. DaimlerChrysler Corp.,* 820 A.2d 1266 (Pa.Super.Ct.2003) (finding plaintiff has statutory right to request treble damages or attorney's fees for UTPCPL violations when defendant refused to make repairs to used vehicle still under warranty, but denying them because plaintiff failed to request such relief before the arbitration board who heard the dispute); *Skurnowicz v. Lucci,* 798 A.2d 788, 796–97 (Pa.Super.Ct.2002) (upholding treble damage award under the UTPCLP when home buyer suffered property damage after seller lied about history of past drainage problems).

Fifth, the *Werwinski* panel made its decision without reference to Pennsylvania case law or statutory construction principles. The court cited one unpublished foreign U.S. District Court opinion in support of its holding. *See Werwinski,* 286 F.3d at 681 (citing to *Weather Shield Mfg., Inc. v. PPG Indus., Inc.,* 1998 WL 469913, at *5 (W.D.Wis. June 11, 1998)).[5]

■ As this is a diversity case where Pennsylvania substantive law controls, we must predict how the Pennsylvania Supreme Court would rule on the question of whether intentional fraud may be barred by the economic loss doctrine by "giving 'proper regard' to the relevant rulings of other courts of the state." *Robertson v. Allied Signal, Inc.,* 914 F.2d 360, 378 (3d Cir.1990). "In the absence of guidance from the state's highest court, we are to consider decisions of the state's intermediate appellate courts for assistance in predicting how the state's highest court would rule." *Gares v. Willingboro Twp.,* 90 F.3d 720, 725 (3d Cir.1996); *see also U.S. Underwriters Ins. Co. v. Liberty Mut. Ins. Co.,* 80 F.3d 90, 93 (3d Cir.1996) ("The rulings of intermediate appellate courts must be accorded significant weight and should not be disregarded absent persuasive indication that the highest court would rule otherwise."). We do not believe that the Pennsylvania Supreme Court would defy the overwhelming and unanimous precedence of its appellate and trial courts or the clear language of the UTPCPL and adopt the reasoning of a foreign federal court's unpublished decision applying Wisconsin state law. *See Commonwealth v. Clark,* 551 Pa. 258, 710 A.2d 31, 39 (1998) ("[I]t is axiomatic that decisions of our federal brethren are not binding on this Court."); *Johnson,* 698 A.2d at 637–40 (stating that Pennsylvania courts are not bound by earlier federal court cases regarding the UTPCPL).

■ Pennsylvania's economic loss doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." *Duquesne Light Co. v. Westinghouse Elec. Corp.,* 66 F.3d 604, 618 (3d Cir.1995). In Pennsylvania, the purpose of the economic loss doctrine is to maintain the separation between the law of contract and the law of tort. *New York State Elec. & Gas Corp. v. Westinghouse Elec. Corp.,* 387 Pa.Super. 537, 564 A.2d 919, 925 (1989); *Blue Mountain Mushroom Co. v. Monterey Mushroom,* 246 F.Supp.2d 394, 401–402 (E.D.Pa.2002). The economic loss

---

**5.** The *Weather Shield,* court stated that "[t]he economic loss doctrine holds commercial purchasers to the bargain they made and prevents them from circumventing their contractual allocation of risk by bringing tort actions which would effectively rewrite their purchase agreements to insert a manufacturer's warranty that was not part of the original bargain." *Id.* Even under the holding of the Wisconsin court, the rule is not applicable to the present suit. It requires the plaintiff to be a "commercial purchaser." O'Keefe is a consumer. The rule bars recovery in tort. O'Keefe's claim is based on statutory law.

doctrine originally applied only to product liability claims, with the expectation that parties could recover purely economic damages under contract theory. *East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 871, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). The expanded reach of the doctrine to cover negligence has been justified on the basis that parties can protect themselves by negotiating the terms of a manufacturer's liability. *Id.* at 872–73, 106 S.Ct. 2295. Pennsylvania courts addressing the economic loss doctrine have accepted the Supreme Court's rationale and focused on the ability of the purchaser to recover economic harm under a breach of warranty claim. *REM Coal Co. Inc. v. Clark Equipment Co.,* 386 Pa.Super. 401, 563 A.2d 128 (1989) (en banc). Thus, "negligence and strict liability theories do not apply in an action *between commercial enterprises* involving a product that malfunctions where the only resulting damage is to the product itself." *REM Coal,* 563 A.2d. at 134 (emphasis added). Pennsylvania's economic loss doctrine bars negligence or strict liability claims between commercial enterprises when the duties between the parties lie in contract. *See East River,* 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (applying doctrine in admiralty law and defining doctrine); *Lower Lake Dock Company v. Messinger Bearing Corp.,* 395 Pa.Super. 456, 577 A.2d 631, 634–34 (1990); *REM Coal,* 386 Pa.Super. 401, 563 A.2d 128 (1989).

The economic loss doctrine is inapplicable to O'Keefe's claims. O'Keefe is alleging a statutory claim in addition to his common law claims. O'Keefe is claiming that MBUSA's actions were part of a fraudulent scheme. Pennsylvania's economic loss doctrine is inapplicable to intentional torts. O'Keefe's entitlement does not stem solely from contract law, because his entitlement to recovery also stems from Pennsylvania statutory law under the UTPCPL. His allegations of fraudulent behavior by MBUSA clearly take this case out of the reach of Pennsylvania's economic loss doctrine. Additionally, O'Keefe is not a commercial entity. He is a consumer.

Moreover, as we recently stated in *Air Prods. Chems., Inc. v. Eaton Metal Prods. Co.,* —— F.Supp.2d ——, 2003 WL 1825069 (E.D. Pa.2003) (Van Antwerpen, J.):

> [W]e find that the underlying purposes of the economic loss doctrine suggest that the Pennsylvania Supreme Court would rule that it does not apply to this kind of fraudulent misrepresentation. As noted above, the economic loss doctrine is premised on the notion that parties to a contract may protect themselves from negligence or defective products by negotiating the liability terms of the contract. *East River S.S. Corp.,* 476 U.S. [at] 872–73[, 106 S.Ct. 2295]. We believe that in both theory and practice, it is impracticable, if not impossible, for parties to negotiate terms regarding what happens if one of them is intentionally deceiving the other. Indeed, if there were deception in the inducement to agree to such terms, we foresee an endless series of sub-agreements as to what happens if one party has intentionally deceived the other into signing an intentional-deception clause. The notion that parties are free to allocate risks of negligence or defect fails when one party is intentionally deceiving the other. *First Republic Bank v. Brand,* 50 Pa. D. & C. 4th 329, 344 (Pa.Comm.Pl. Dec. 19, 2000) ("A party to a contract cannot rationally calculate the possibility that the other party will deliberately misrepresent terms critical to that contract. Public policy is better served by leaving the possibility of an intentional tort suit hanging over the head of a party considering outright fraud.") (internal citations omitted).

We have original subject matter jurisdiction over O'Keefe's claims. His claim meets the amount in controversy requirement because O'Keefe has properly requested treble damages under the UTPCPL.

*B. Subject Matter Jurisdiction, Removal, Amended Complaints, and New Claims*

The parties correctly stated that subject matter jurisdiction is to be determined at the time of removal and that in diversity cases "it is well-settled that there is very little that a plaintiff can do that will defeat federal subject matter jurisdiction and force a remand to state court." *See* 14B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3721 at n. 97 (3d ed.1998), *quoted in* Parties' Joint

Supp. Br. on Subject Matter Jurisdiction, at 4 filed on Feb. 20, 2003 [156–1].

### 1. Subject Matter Jurisdiction over the Plaintiff's Complaint is Determined at the Time of Removal

■ The plaintiff's complaint at the time of removal controls a district court's subject matter jurisdiction inquiry when the case is based on diversity jurisdiction. *See St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845 ("[T]he status of the case as disclosed by the plaintiff's complaint is controlling in the case of a removal. . . ."); *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 666 (3d Cir.2002) ("A district court's determination as to the amount in controversy must be based on the 'plaintiff's complaint at the time the petition for removal was filed.'") (quoting *Steel Valley Auth. v. Union Switch and Signal Div.*, 809 F.2d 1006, 1010 (3d Cir.1987)); *Meritcare Inc. v. St. Paul Mercury Ins. Co.*, 166 F.3d 214, 217 (3d Cir.1999) (determining amount in controversy at time of removal). This mirrors the rule in originally filed cases "where the inquiry is directed to the time when the complaint is filed." *Meritcare Inc. v. St. Paul Mercury Ins. Co.*, 166 F.3d 214, 217 (3d Cir.1999) (citing *Pullman v. Jenkins*, 305 U.S. 534, 59 S.Ct. 347, 83 L.Ed. 334 (1939)).

■ Any post-removal event,[6] whether a result of plaintiff's own volition or outside of plaintiff's control, that reduces the amount in controversy below 28 U.S.C. § 1332's jurisdictional floor will not deprive the court of subject matter jurisdiction. *See Red Cab Co.*, 303 U.S. at 293, 58 S.Ct. 586; *Smiga v. Dean Witter Reynolds, Inc.*, 766 F.2d 698, 703 (2d Cir.1985) ("Amendment of a pleading in an effort to rescind jurisdiction over an issue on which a court has already acted is

not permitted."); *Albright v. R.J. Reynolds Tobacco Co.*, 531 F.2d 132, 135 (3d Cir.1976). This long held rule protects the defendant's statutory right of removal under 28 U.S.C. § 1441. *See Red Cab Co.*, 303 U.S. at 293, 58 S.Ct. 586. Without solidifying subject matter jurisdiction at the time of removal, the plaintiff would be able to thwart federal jurisdiction by reducing the prayer for relief.[7] This would render the defendant's statutory right of removal "subject to the plaintiff's caprice." *Red Cab Co.*, 303 U.S. at 293, 58 S.Ct. 586 ("If the plaintiff could, no matter how bona fide his original claim in the state court, reduce the amount of his demand to defeat federal jurisdiction the defendant's supposed statutory right of removal would be subject to the plaintiff's caprice."); *Albright v. R.J. Reynolds Tobacco Co.*, 531 F.2d 132, 135–36 (3d Cir.1976) (finding district court has jurisdiction when plaintiff amended complaint post removal to reduce the amount in controversy).

Nothing we heard at oral arguments, read in the parties' briefs or read in the objectors' briefs lead us to question our subject matter jurisdiction over O'Keefe's claim. O'Keefe never amended his complaint in a fraudulent manner in an attempt to thwart this court's jurisdiction. He neither lowered the amount he demanded nor attempted to join non-diverse defendants. Subject matter jurisdiction still exists over O'Keefe's claim because it existed at the time of removal and there has not been subsequent revelation evidencing that removal was improperly granted.

### 2. The Issue

■ We were concerned about a different issue when we raised the question of subject matter jurisdiction in our February 14, 2003 Order. After our July 13, 2001 Order,

---

**6.** "A distinction must be made ... between subsequent events that change the amount in controversy and subsequent revelations that, in fact, the required amount was or was not in controversy at the commencement of the action." *See State Farm Mutual Automobile Ins. Co. v. Powell*, 87 F.3d 93, 97 (3d Cir.1996), *quoted in Meritcare Inc.*, 166 F.3d at 217. Only a subsequent revelation regarding the amount in controversy will remove subject matter jurisdiction once the federal court has exercised subject matter jurisdiction. This distinction is not a relevant issue in

the case because there has not been a subsequent event or revelation affecting the amount in controversy between O'Keefe and MBUSA.

**7.** This is different from the situation where the plaintiff attempts to instigate a remand by joining a non-diverse defendant. This situation is governed by 28 U.S.C. § 1447(e) and "the court may deny joinder, or permit joinder and remand the action to the State court." 28 U.S.C. § 1447(e). This statute's analysis is similar to a Rule 19(b) inquiry. *See* 14C Wright et al., *supra* § 3739.

O'Keefe submitted an amended complaint adding a Magnuson–Moss Warranty Act Claim on behalf of the proposed Pennsylvania state class. Defendant moved to dismiss the new claims. Our January 31, 2002 Memorandum and Order dismissed the Magnuson–Moss Claim "without prejudice for lack of subject matter jurisdiction" because of a technical defect.[8] O'Keefe then filed a Second Amended Complaint that proposed a nationwide class instead of a Pennsylvania only class. Shortly thereafter, the parties reached a settlement. We never ruled on our subject matter jurisdiction over the proposed class plaintiffs from other jurisdictions. O'Keefe must demonstrate that each newly proposed class member's claims meet the jurisdictional minimum of § 1332.

This case presents a novel question regarding removal jurisdiction, subject matter jurisdiction, class actions and post-removal joinder. Does the solidification of subject matter jurisdiction over the named plaintiff's claim in a diversity class action removed to federal court allow the plaintiff to amend his complaint post-removal to propose a nationwide class action without analyzing the subject matter jurisdiction for the newly proposed plaintiffs? Specifically, can the plaintiff include new class members post-removal from jurisdictions where the state law claims against the defendant do not meet § 1332's amount in controversy? We believe the answer is no.

The issue arises because O'Keefe has proposed to join plaintiffs from jurisdictions where plaintiffs are limited to only recover actual damages under the state's consumer protection statute. Without the trebling of damages, O'Keefe's own claim would not meet the requisite amount in controversy to confer diversity jurisdiction his statutory claim.

O'Keefe and MBUSA maintain that we have subject matter jurisdiction over the state law claims of the proposed nationwide class members because we exercised jurisdiction over O'Keefe's claim when it was removed by MBUSA in our July 13, 2001 Order.[9] The parties rely on the case precedence discussed *supra* Section II.B.1. We disagree because: (1) our July 13, 2001 Order established subject matter jurisdiction only over claims brought by O'Keefe and the proposed class of Pennsylvania plaintiffs; (2) the joinder of new plaintiffs requires a subject matter jurisdiction inquiry; and (3) subject matter jurisdiction cannot be established indirectly when it could not be established directly.

 *a. Subject Matter Jurisdiction at the Time of Removal is Limited to Claims Contained in the Removed Complaint.*

 When a court finds that a diversity case has been properly removed to federal court, the court must also find that it has

8. We stated that:

> [f]ollowing removal to federal court, a plaintiff may only add claims over which the federal courts have jurisdiction. *See Freeman v. Bee Machine Co.*, 319 U.S. 448, 451–52, 63 S.Ct. 1146, 87 L.Ed. 1509 (1943), cited in 3 James William Moore, *Moore's Federal Practice* § 15.16[5] (3d ed.1997) (noting that amended pleadings after removal are proper if they assert new claims that "would have been permitted had the suit originated in federal court"). Clearly, had this suit originated in federal court, we would lack subject matter jurisdiction over this class action under Magnuson–Moss with fewer than 100 plaintiffs under the plain language of 15 U.S.C. § 2310(d)(3)(C). *O'Keefe v. Mercedes–Benz USA, LLC*, No. 01–CV–02902, 2002 U.S. Dist. LEXIS 6973, at *15–16 (E.D.Pa. February 1, 2002).

9. The parties do not claim that we have supplemental jurisdiction over state law claims by plaintiffs whose state law does not provide recovery above $75,000. This jurisdiction follows the pre–1990 rule set forth in *Zahn* where the Supreme Court stated that all members of the class must satisfy the amount in controversy. Following the Supreme Court's *Finley* decision, Congress has amended § 1367 in 1990. Facially the statute appears to allow supplemental jurisdiction over unnamed class members' claims without regard to the amount in controversy, so long as the named plaintiffs meet § 1332's amount in controversy. In *Free v. Abbott Labs., Inc.*, 176 F.3d 298 (5th Cir.1999), the Fifth Circuit held that § 1367(b) overruled *Zahn*. An equally divided Supreme Court affirmed the Fifth Circuit's opinion. *See Free v. Abbott Labs., Inc.*, 529 U.S. 333, 120 S.Ct. 1578, 146 L.Ed.2d 306 (2000) (per curiam). The Third Circuit still follows *Zahn*. *See Meritcare*, 166 F.3d at 218–22. For a more in depth discussion see *Lyon v. Caterpillar, Inc.*, 194 F.R.D. 206, 208–09 n. 2 (E.D.Pa.2000) and *In re Prudential*, 148 F.3d 283, 305–06 (3d Cir. 1998).

subject matter jurisdiction over the plaintiff's claim contained in the complaint [10] at the time of removal. *Cf.* FED.R.CIV.P. 8(a) (jurisdiction depends on claims in pleadings); 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1208 (2d ed. 1990) (In diversity cases, "[t]he complaint must affirmatively demonstrate that *the claim* is within the subject matter jurisdiction of the federal court because these tribunals are courts of limited jurisdiction.") (emphasis added). The court finding does not mean that subject matter jurisdiction will exist over all hypothetical claims that may be later filed during the action's journey through federal court. This is why a plaintiff's attempt to amend his complaint postremoval by reducing the amount in controversy is dealt with differently then when the plaintiff amends his complaint to join a non-diverse party or cross-claim against a non-diverse third-party. When a party reduces the amount in controversy, he is altering a claim that the court has already established subject matter jurisdiction over. *See* discussion *supra* Section II.B.1. In contrast, when the complaint is amended to assert a new claim against a non-diverse party by joinder or third-party practice, the court must analyze it's subject matter jurisdiction over the new claim because it was not present at the time of removal. *See* 28 U.S.C. § 1447(e) (directing district court to use discretion as to whether to remand an action when a claim against a joined defendant would destroy diversity); *cf. Smiga,* 766 F.2d at 703 ("Amendment of a pleading in an effort to rescind jurisdiction over an issue on which a court has already acted is not permitted").

Subject matter jurisdiction over a new claim is routinely analyzed in diversity cases when it is asserted for or against third parties,[11] a permissively joined party,[12] or a compulsorily joined party.[13] When a new claim is alleged against a non-diverse party in a removed action, the district court is required to analyze jurisdiction. *See* 28 U.S.C. § 1447(e).

Our July 13, 2001 Order found that subject matter jurisdiction existed over O'Keefe's claim against MBUSA. The Order was limited to the claims originally contained in the removed complaint. Each claim—new or old—must be separately analyzed in a diversity action for the court to invoke subject matter jurisdiction. *See Zahn v. International Paper Co.,* 414 U.S. 291, 294–95, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973) (requiring each plaintiff to meet the jurisdictional amount when they are bringing separate and distinct claims). This is evident in our January 31, 2001 Memorandum and Order which dismissed the proposed class's Magnuson–Moss claim. Neither party argued at that time that our July 13, 2001 finding of subject matter jurisdiction shielded the new claim from scrutiny. Instead, our January 31, 2001 Memorandum and Order dismissed the claim pursuant to 15 U.S.C. § 2310(d)(3)(C) for lack of subject matter jurisdiction. The new claims by the newly defined class, like the previous Magnuson–Moss claims, cannot be shielded from a prior finding of subject matter jurisdiction at the time of removal.

### b. Analyzing Jurisdiction Over the Newly Proposed Class Members

The parties were unable to find an analogous situation in the case law where a plain-

**10.** The district court may look at the entire state court record to determine if removal is proper. *See* 14B Wright et al., *supra* § 3721 at nn. 73–79 (citations omitted).

**11.** *See Owen Equip. & Erection Co. v. Kroger,* 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978) (denying jurisdiction over claim between plaintiff and third-party defendant when parties were not diverse); 6 Wright et al., *supra* § 1433 (discussing the need to monitor cross-claims for subject matter jurisdiction in diversity cases).

**12.** *El Chico Restaurants, Inc. v. Aetna Cas. & Sur. Co.,* 980 F.Supp. 1474, 1483–84 (S.D.Ga.1997) (analyzing subject matter jurisdiction over claims brought by permissively joined plaintiffs and finding supplemental jurisdiction over their claims); *Moncion v. Infra–Metals Corp.,* 2002 WL

31834442 (S.D.N.Y. Dec.18, 2002) (analyzing subject matter jurisdiction under § 1332 & 1447(e) when plaintiff moved to join new defendant); 7 Wright et al., *supra* § 1659 (discussing the complications when permissively joined parties are not diverse from the claimant).

**13.** Fed.R.Civ.P. 19 (requiring a subject matter jurisdiction inquiry in diversity cases when joinder of a plaintiff or defendant); *El Chico Restaurants,* 980 F.Supp. at 1484 (analyzing subject matter jurisdiction over claims asserted against newly joined defendant and remanding case under § 1447(e) for lack of diversity jurisdiction); 7 Wright et al., *supra* § 1610 (discussing subject matter jurisdiction and Rule 19).

tiff expanded the proposed class from a state-wide to a nationwide class action after the federal court initially exercised jurisdiction pursuant to §§ 1332 & 1441. The cases that the parties have cited in support of their argument all deal with situations where the plaintiff attempted to thwart federal jurisdiction by either lowering the amount in controversy or joining or cross-claiming against non-diverse parties. *See,* Parties' Joint Supplemental Br. on Subject Matter Jurisdiction, at 2–4 filed on Feb. 20, 2003 [156–1] (citing, e.g., *Freeport–McMoRan, Inc. v. KN Energy, Inc.,* 498 U.S. 426, 428, 111 S.Ct. 858, 112 L.Ed.2d 951 (1991) (retaining jurisdiction when defendant corporation transferred its interest to a limited partnership that contained non-diverse partners because subsequent change in citizen of the parties does not disturb diversity jurisdiction); *Werwinski,* 286 F.3d at 665 (denying plaintiff's attempt to remand when plaintiff lowered amount in controversy); *BEM I, L.L.C. v. Anthropologie, Inc.,* 301 F.3d 548, 551 (7th Cir.2002) (same); *American Dental Indus. v. EAX Worldwide, Inc.,* 228 F.Supp.2d 1155, 1157 (D.Or.2002) (same); *Poore v. American–Amicable Life Ins. Co.,* 218 F.3d 1287, 1290 (same); *Albright,* 531 F.2d at 135 (same). In some of the cases that the parties cited, the court did remand the action. *See Leonard v. Enterprise Rent A Car,* 279 F.3d 967, 972 (11th Cir.2002) (remanding case when a reasonable interpretation of the complaint did not allege the requisite amount in controversy); *Millar v. Bay Area Rapid Transit Dist.,* 236 F.Supp.2d 1110, 1119–20 (remanding case when plaintiff voluntarily dismissed federal claim and state law claim did not meet the amount in controversy)). In each of the cases cited by the parties, the court was considering the subject matter jurisdiction over the original or new claims brought by the *original* plaintiff. In this instance we are only questioning our jurisdiction over the new claims by the *new* plaintiffs. The claims brought by the original plaintiffs—O'Keefe and the Pennsylvania resident class members—are not at issue.

After an extensive search, we have found only one analogous case. In *Indianer v. Franklin Life Ins. Co.,* 113 F.R.D. 595 (S.D.Fl.1986), the district court determined that subject matter jurisdiction existed over the Florida-wide class's claims when the case was removed to federal court. The named plaintiff was from Florida, the defendant was from Illinois, and each class member's claim met the amount in controversy threshold. *See Indianer,* 113 F.R.D. at 597. Thereafter, plaintiff amended the claim to allege a suit on behalf of all defendant's customers throughout the country. *Id.* The court stated that, "[b]ecause Plaintiff's attempt to expand the state class into a nationwide class creates new issues which might affect subject matter jurisdiction, we properly address the issue of subject matter jurisdiction *de novo* at this time." *Id.* at 598 n. 3. The court found jurisdiction lacking. Neither the law of the case nor the prior order establishing subject matter jurisdiction prevented the court from re-analyzing subject matter jurisdiction over the named plaintiff's claims or analyzing jurisdiction for the first time over the nationwide class. *Id.* at 598–605 & n. 3.

We have the same situation in the present case. The proposed nationwide class action is wholly different from the statewide class action in scope and magnitude. We have never asserted jurisdiction over the nationwide class members. We are required to *sua sponte* question our own jurisdiction because we are a court of limited jurisdiction. *See Owen's Equip. & Erection Co. v. Kroger,* 437 U.S. 365, 374, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978) ("It is a fundamental precept that federal courts are courts of limited jurisdiction. The limits upon federal jurisdiction, whether imposed by the Constitution or by Congress, must be neither disregarded nor evaded."); *Meritcare,* 166 F.3d at 217–18 & n. 3 (warning that a court order is not enforceable if jurisdiction was lacking) (citing *Employers Ins. of Wausau v. Crown Cork & Seal Co.,* 905 F.2d 42, 45 (3d Cir.1990) (obligating courts to consider their own jurisdiction because federal courts are courts of limited jurisdiction)).

Rule 23(b)(3) class actions are technically joinder vehicles. *See Zahn,* 414 U.S. at 296, 299–300 & n. 6, 94 S.Ct. 505 (comparing class action and joinder cases; stating that amount in controversy requirement identical in both situations) (citations omitted); *Snyder,* 394 U.S. at 337, 89 S.Ct. 1053 (same); 7A Wright

et al., *supra* § 1752 (discussing history of Rule 23, spurious class actions and joinder). Each class member's claim must satisfy § 1332's amount in controversy. *See Zahn,* 414 U.S. at 294–95, 301, 94 S.Ct. 505 (requiring each plaintiff with separate and distinct claims in a 23(b)(3) class action to satisfy the amount in controversy); *Pinel v. Pinel,* 240 U.S. 594, 596, 36 S.Ct. 416, 60 L.Ed. 817 (1916) (requiring each plaintiff with a "separate and distinct demand" in a joinder case to satisfy the amount in controversy); *Meritcare,* 166 F.3d at 218 (stating that joinder and class action cases both require each plaintiff with a distinct and separate claim to meet the amount in controversy requirement); *see also* text *supra* note 9 (discussing the Third Circuit's adherence to *Zahn* despite the 1990 amendment to 28 U.S.C. § 1367).

Expanding the proposed class is a joinder of new plaintiffs to the action through the class action vehicle. *See Snyder v. Harris,* 394 U.S. 332, 337, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969). In *Snyder,* the Supreme Court stated that the rule barring the aggregation of claims among joined plaintiffs to meet § 1332's jurisdictional minimum should be applied to class actions. *See Id.* at 336–37, 89 S.Ct. 1053. The Court found no logical difference between a mass joinder of plaintiffs and a class action of plaintiffs. In both litigation procedures, the requisite amount in controversy must be reached by each plaintiff because each plaintiff is pursuing an individual claim.

The Supreme Court stated that: "Each plaintiff in a Rule 23(b)(3) class action must satisfy the jurisdictional amount, and any plaintiff who does not must be dismissed from the case—'one plaintiff may not ride on another's coattails.'" *Zahn,* 414 U.S. at 301, 94 S.Ct. 505 (quoting *Zahn v. International Paper Co.,* 469 F.2d 1033, 1035 (2d Cir.1972)). This rule cannot be ignored merely because this case was removed to federal court rather than originated in federal court.

We do not have original jurisdiction over the claims brought on behalf of many of the newly defined class members. Because the state law only allows for actual damage, we only have jurisdiction pursuant to § 1332 over class members who paid over $75,000 for their vehicles in Arkansas, Florida, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, New York, Ohio, Oklahoma, South Dakota, Utah, West Virginia or Wyoming. We have diversity jurisdiction over class members who paid over $74,000 for their vehicle in Nevada because the state law allows for actual damages plus $1,000. We have diversity jurisdiction over class members who paid over $37,500 for their vehicle in Wisconsin because the state law allows for double damages. It is a legal certainty that the other class members from these states cannot recover over the jurisdictional minimum on their statutory claims. We have diversity jurisdiction over all claimants from all other jurisdictions because all other state statutory laws allow for punitive, multiple or treble damages.[14]

### c. Subject Matter Jurisdiction Cannot Be Established Indirectly When it Could Not Be Established Directly

In an attempt to secure our subject matter jurisdiction, litigants cannot do indirectly what they may not do directly. *See Cummings v. Missouri,* 4 Wall. 277, 71 U.S. 277, 325, 18 L.Ed. 356 (1866) ("The legal result must be the same, if there is any force in the maxim, that what cannot be done directly cannot be done indirectly...."); *Packard v. Provident Nat'l Bank,* 994 F.2d 1039, 1049 (3d Cir.1993) (quoting the maxim to disallow a plaintiff class action lawsuit to change a legal claim into an equitable claim so as to meet § 1332's amount in controversy requirement of § 1332); *Pohl v. NGK Metals Corp.,* 117 F.Supp.2d 474, 477 (E.D.Pa.2000) (same). Moreover, a plaintiff may only amend a complaint post-removal to assert a claim that could have originated in federal court. *Freeman v. Bee Mach. Co.,* 319 U.S. 448, 451–52, 63 S.Ct. 1146, 87 L.Ed. 1509 (1943); 3 James William Moore, *Moore's Federal Practice* § 15.16[5].

---

**14.** The categories were complied using Plaintiff's State Law Appendix filed on August 7, 2002 [62– 2].

O'Keefe could not achieve subject matter jurisdiction over the insufficient claims directly. If O'Keefe had originally filed his claim in federal court and requested certification of a nationwide class action, we would have been bound by the decisions in *Zahn* and *Meritcare* to disavow jurisdiction over many of the proposed class members. *See In re School Asbestos Litig.*, 921 F.2d 1310, 1315 (3d Cir.1990) ("*Zahn* does not require that an entire class action be dismissed for lack of subject matter jurisdiction over some class members. Rather, the court is required only to dismiss those class members whose claims appear to a 'legal certainty' to be less than the jurisdictional amount."). If O'Keefe had originally filed his claim in state court seeking a nationwide class action, upon MBUSA's subsequent removal, we would have had discretion to remand the entire case or remand only the insufficient claims. *See Meritcare*, 166 F.3d at 218 (requiring remand of claims that do not meet the amount in controversy); *Mehlenbacher v. Akzo Nobel Salt, Inc.*, 207 F.Supp.2d 71 (W.D.N.Y.2002) (concluding that the court could—in the interest of judicial economy and to avoid other complications—remand the proposed class action in its entirety or only the class members whose claims do not meet the amount in controversy); *see also* 14C Wright et al., *supra* § 3725 n. 55–56. Therefore O'Keefe may not do this indirectly.

This holding is guided by the Supreme Court's opinion in *Owen's Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978). In *Kroger*, the Iowa plaintiff filed suit in federal court against a Nebraskan electric company in a wrongful death action. The Nebraska defendant filed a third-party complaint joining the company that manufactured the crane that killed plaintiff's husband. The plaintiff amended her complaint to assert a claim against the third-party defendant. It subsequently came to light that the plaintiff and the third-party defendant were not diverse. The Supreme Court held that there was no original or ancillary jurisdiction over the new claim because complete diversity was destroyed. *Id.* at 374–75, 98 S.Ct. 2396 (citing *Zahn v. International Paper Co.*, 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973) *passim* (requiring each claim by each plaintiff or class member

to independently satisfy the minimum jurisdictional amount); *Snyder*, 394 U.S. 332, 338–39, 89 S.Ct. 1053, 22 L.Ed.2d 319 (requiring complete diversity)). Although the court found no collusion between the parties in *Kroger*, the court was concerned that if ancillary jurisdiction would permit non-diverse cross-claims, then § 1332's strict requirements would be vitiated. Such a rule would allow a plaintiff to sue only the diverse defendants to gain federal jurisdiction, knowing full well that the defendant would join the non-diverse defendants. *Id.* at 377, 98 S.Ct. 2396 ("To allow the requirement of complete diversity to be circumvented as it was in this case would simply flout the congressional command.").

Although we do not believe that O'Keefe intentionally attempted to circumvent § 1332, we must deny his attempt to base diversity jurisdiction on the insufficient state statutes. We must avoid creating a loophole that plaintiffs lawyers could drive a truck through. In the future, a class action plaintiff could file a statewide class action in a state that allowed treble or punitive damages, knowing that the out of state defendant would remove to federal court. The plaintiff would then wait until the district court exercised removal jurisdiction pursuant to §§ 1332 and 1441. Next, Plaintiff would amend his complaint pursuant to Rule 15 and assert a nationwide class action that included class members from states where the state law does not afford plaintiffs over $75,000 in relief. This scheme would only work if either the law of the case or the initial finding of removal jurisdiction prevented the court from analyzing jurisdiction over the newly proposed class members. Federal courts may not allow a Rule 15 amendment to expand jurisdiction in violation of the express language of §§ 1332 and 1447(e). Nor may we permit an amendment that adds claims that lie outside of our original jurisdiction. *See Freeman*, 319 U.S. at 451–52, 63 S.Ct. 1146.

### d. Objectors' Challenge to Subject Matter Jurisdiction

The Pitts did not object to subject matter jurisdiction in their original brief objecting to

the class settlement. *See* Objectors' Memo. Br. in Opp'n to Class Settlement filed Dec. 11, 2002 [123–]. They raised the issue at the December 20, 2002 settlement hearing. *See* Tr. at 221. Pitts counsel stated that they were questioning subject matter jurisdiction over the class based upon *Zahn* and *Snyder* but did not elaborate further. They stated that they wanted to mention subject matter jurisdiction in case they needed to preserve it for appeal. *Id.*

Objectors submitted three briefs that expanded on their jurisdiction argument. In the first such brief filed on February 11, 2003, the Objectors noted that the UTPCPL does not govern the claims brought by non-Pennsylvania class members. The Pitts cite *Zahn* and *Snyder* for the proposition that every class member must meet § 1332's amount in controversy requirement. *See* Objectors' Post–Hearing Br., at 34–35 filed Feb. 11, 2003 [153–1]. Specifically, Pitts stated that the Alabama class members' claims did not meet the amount in controversy. *Id.* at 35.

In our February 14, 2003 Order requiring additional oral arguments, we noted that Pitts was disingenuous about Alabama law. Alabama does in fact allow treble damage awards under its Consumer Protection and Deceptive Practices law:

> Up to three times any actual damages, in the court's discretion. In making its determination under this subsection, the court shall consider, among other relevant factors, the amount of actual damages awarded, the frequency of the unlawful acts or practices, the number of persons adversely affected thereby and the extent to which the unlawful acts or practices were committed intentionally. . . .

ALA.CODE § 8–19–10(a)(2). Therefore we have subject matter jurisdiction over the Alabama claims pursuant to § 1332.

▆ The Pitts objectors then changed their tune at the February 20th oral arguments. *See* Tr. of Feb. 20, 2003, at 37–40; Objector's Post–Heating Brief Regarding Subject Matter Jurisdiction filed on Mar. 28,

2003 [177–1].[15] They then claimed that the Alabama claims were barred under ALA.CODE § 8–19–10(f):

> A consumer or other person bringing an action under this chapter may not bring an action on behalf of a class; provided, however, that the office of the Attorney General or district attorney shall have the authority to bring action in a representative capacity on behalf of any named person or persons. In any such action brought by the office of the Attorney General or a district attorney the court shall not award minimum damages or treble damages, but recovery shall be limited to actual damages suffered by the person or persons, plus reasonable attorney's fees and costs.

The Pitts maintain that treble damages are not available in Alabama because the state law bans class actions based on violations of Alabama's Deceptive Trade Practices Act. We disagree. This is a procedural law and not a substantive law. It is not binding on a federal court under the *Erie* doctrine. *See Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, (1938) (holding that when a federal court sitting in diversity enforces state substantive law but federal procedural law). A bar on class actions is a bar to the court's equitable power to allow joinder in an attempt to conserve judicial economy. Alabama has chosen to bar its courts from allowing any class actions predicated on any state's deceptive trade practices act in its own state courts. The bar is not limited to class actions alleging violations of Alabama's statute. For example, in *Ex Parte Exxon Corp.,* 725 So.2d 930 (Al.1998), the Alabama Supreme Court stated that the Alabama state courts could not entertain a class action lawsuit based on a violation of New Jersey's deceptive trade practices act. The court stated that "plaintiffs are *procedurally* barred from representing a class" because it would violate ALA.CODE § 8–19–10(f)'s bar on class actions in Alabama state court. *Id.* at 933 (emphasis added). The court interpreted ALA.CODE § 8–19–10(f) as a procedural bar and not a substantive bar.

---

15. For some reason, this brief was not docketed when submitted to the court. The filing date coincides to the date when we became aware of the error and had the brief docketed. It was signed and mailed on February 20, 2003 and presented to the court in person on that date. *See* Tr. of Feb. 20, 2003, at 20 (presenting brief to the court at the hearing).

There is nothing in the statute that would prevent a federal court from grouping the potentially thousands of Alabama plaintiffs into a class action in order to conserve federal court resources. *See Erie*, 304 U.S. at 92, 58 S.Ct. 817 ("The line between procedural and substantive law is hazy, but no one doubts federal power over procedure."). Alabama law does not destroy our jurisdiction over Alabama resident class members.

In the Pitts' third brief covering the issue, they seemed to have dropped their § 8–19–10(f) argument. *See* Objectors' Joint Supplemental Memo. Regarding the Court's Lack of Subject Matter Jurisdiction filed Mar. 10, 2003 [169–1]. Instead, they provide a more detailed argument along the lines of *Zahn* and *Snyder* that they alluded to during the December 20th Settlement Hearing. We have already addressed this argument *supra* Sections II.B.2 & II.B.2.a-c. Objectors correctly cite the law, albeit in a cursory manner. They did not discuss or rebut the parties' argument that our prior finding of jurisdiction over O'Keefe's claims pursuant to §§ 1332 & 1441 barred an inquiry into our subject matter jurisdiction over the newly defined class.

## C. The Magnuson–Moss Claim Will Be Remanded

As discussed *supra* Section II.B.2., we dismissed O'Keefe's Magnuson–Moss claim because of a technical defect in the pleading. O'Keefe re-filed the claim in the Philadelphia Court of Common Pleas on February 21, 2003. MBUSA promptly removed the action to federal court. The new complaint was consolidated with this case on February 26, 2003.

The Magnuson–Moss Warranty Act is a federal act with its own amount in controversy requirement separate from 28 U.S.C. § 1332. It is limited to claims where the amount in controversy equals or exceeds $50,000. 15 U.S.C. § 2310(d)(3)(B). When a Magnuson–Moss class action is originally filed in federal court, the class action must contain 100 named plaintiffs. 15 U.S.C. § 2310(d)(3)(C). No such requirement exists when the suit originates in state court. *See O'Keefe*, 2002 WL 377122, at *4 (acknowledging the "strange and unfair" outcomes because of a quirk in the Magnuson–Moss Act).

As stated *supra*, any civil action brought in state court may be removed by the defendant to the federal district court in the district where such action is pending, if the district court would have original jurisdiction over the matter. *See* 28 U.S.C. 1441(a); *Franchise Tax Bd.*, 463 U.S. at 7–8, 103 S.Ct. 2841; *U.S. Express Lines Ltd.*, 281 F.3d 383, 388–89 (3d Cir.2002). In order for a United States court to have jurisdiction over a Magnuson–Moss claim, there must $50,000 or more in dispute between the parties and over one hundred named plaintiffs. 15 U.S.C. § 2310(d)(3). O'Keefe's own claim does not meet the jurisdictional threshold for a Magnuson–Moss claim because his vehicle cost less than $50,000. This new Magnuson–Moss class action still lacks one hundred named plaintiffs. It may not be removed to federal court pursuant to § 1441 because it is not a claim that could have been originally filed in federal court. *See Freeman*, 319 U.S. at 451–52, 63 S.Ct. 1146. The nationwide Magnuson–Moss class action will be remanded. While the Magnuson–Moss claim is not before us, the settlement does provide for class release of this claim. The Magnuson–Moss Warranty Act does not require that class actions pursuing Magnuson–Moss claims in state court to meet the $50,000 threshold or the one hundred named plaintiff rule.

## D. We Have Subject Matter Jurisdiction Over the Proposed Class Members' Common Law Fraud and Unjust Enrichment Claims

As with the state consumer statutes, we have had jurisdiction over O'Keefe and the Pennsylvania class members since we exercised removal jurisdiction pursuant to §§ 1332 & 1441. Common law claims for unjust enrichment and fraud have been contained in the original complaint when removed and in the Amended Complaint on behalf of O'Keefe and the proposed Pennsylvania-wide class. The Second Amended Complaint contains sufficient allegations of fraudulent behavior such that the claims have been preserved. The Second Amended Com-

plaint requests punitive damages and all other relief obtainable on behalf of the class.

The Pitts objected to subject matter jurisdiction based on the unjust enrichment claims. They accurately stated that the class members may not aggregate their individual unjust enrichment claims to meet the amount in controversy. *See* Tr. of Feb. 20, 2003, at 24–25. This is of course the *Snyder* rule. *See Snyder*, 394 U.S. at 335–37, 89 S.Ct. 1053. However, O'Keefe is not attempting to aggregate the class members's individual and distinct claims in an attempt to confer federal jurisdiction. O'Keefe has never attempted to do so. Instead, O'Keefe argues that the availability of punitive damages would ensure that each class members' individual claim reached the $75,000 threshold.

We believe that the actual damage assessment should be the purchase price of the vehicles. When discussing Pennsylvania law, Judge O'Neill of this Court stated that:

> Where an alleged defect relates to a discreet [sic], modular, or incidental part of the vehicle (such as the tires, windshield wipers or stereo), it is unreasonable to use the purchase price as a baseline for measuring the amount in controversy. In such cases, the better measure of damages is the replacement cost of the part in question. However, where an alleged defect relates to an integrated system that is necessary to the safe operation of the vehicle (such as the engine or transmission), it is reasonable to assume that the baseline for damages is the purchase price of the car.

*McLaughlin v. Volkswagen of America, Inc.*, 2000 WL 1793071, at *3 (E.D.Pa.2000) (citations omitted); *cited by Werwinski v. Ford Motor Co.*, 286 F.3d 661, 669 (3d Cir.2002). Although the court's holding was limited to Pennsylvania law, we believe it is apt for the situation here. The O'Keefe class alleges an engine and computer system defect that may render the entire car inoperable. The class further alleges that defendant fraudulently concealed the defect and deceptively misrepresented the product. Under such circumstances, the vehicle's entire value is at issue. It is not the situation where an important yet ancillary part, like a tire, contains the defect. We acknowledge that this court must look to state substantive law to determine damages under the *Erie* doctrine. However, O'Neill's reasoning is persuasive and unjust enrichment claims at common law are fairly universal. *See Singer v. AT & T*, 185 F.R.D. 681, 692 (S.D.Fla.1998).

We have original jurisdiction over these claims. The parties are diverse because the named plaintiff and the defendant are diverse. There is over $75,000 in dispute for *all* class members. Each class members' vehicle range in price from $30,450 to $137,300. O'Keefe has adequately requested all legal and equitable relief allowed. This includes punitive damages. It would not be unreasonable to assume that a jury may award at least double or treble punitive damages. After taking into account punitive damages, attorney's fees and cost, the claims exceed the jurisdictional threshold. *See In re School Asbestos Litig.*, 921 F.2d at 1315 ("[T]he court is required only to dismiss those class members whose claims appear to a 'legal certainty' to be less than the jurisdictional amount."); *Angus v. Shiley Inc.*, 989 F.2d 142, 146 (3d Cir.1993) (measuring the amount "not ... by the low end of an open-ended claim, but rather by a reasonable reading of the value of the rights being litigated.").

### E. We Have Supplemental Jurisdiction Over the State Statutory Claims

We have supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the class members' state law consumer protection or deceptive trade practice act claims because these claims are part of the same case and controversy as the unjust enrichment and fraud claims.

### F. Jurisdiction Conclusion

We have original subject matter jurisdiction over all class members' unjust enrichment and fraud claims pursuant to § 1332. We have original subject matter jurisdiction pursuant to § 1332 over the state statutory claims when the requisite state statute allows for over $75,000 in treble damages. We have supplemental jurisdiction over the state statutory claims where the requisite state statute allows relief equal to or less than $75,000

pursuant to § 1367(a) because the claims are so related to the original jurisdiction claims.

### III. SETTLEMENT CLASS CERTIFICATION UNDER RULE 23

Settlement classes may be certified pursuant to Rule 23. *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 618, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 792–94 (3d Cir.1995). In order to certify a class under Rule 23, the class representative must fully comply with the four requirements of Rule 23(a) and fulfill the requirements of either Rule 23(b)(1), 23(b)(2) or (b)(3). *See Monahan v. City of Wilmington,* 49 Fed. Appx. 383, 384 (3d Cir.2002). Rule 23's main concern is "whether a proposed class has sufficient unity so that absent members can be fairly bound by decisions of the class representatives." *Amchem,* 521 U.S. at 621, 117 S.Ct. 2231.

Plaintiff and Defendant jointly move this court to certify a nationwide class under Rule 23(b)(3). This court conditionally certified a settlement class consisting of:

> All persons throughout the United States (including Puerto Rico and U.S. territories) who at the time of Final Settlement own or lease a model year 1998, 1999, 2000, 2001 (first purchase or leased on or before March 31, 2001) Mercedes–Benz vehicle equipped with the Flexible Service System.

Case Management Order, at ¶ 2 filed on Aug. 14, 2002 [64–1]. The conditional certification enabled the parties to mail the proposed class members notification regarding of the motion for class certification and settlement proposal. The proposed class is proper and it complies with Rule 23(a) and 23(b)(3)'s preconditions for class certification.

### A. Rule 23(a)

Class members seeking to represent the class must satisfy the four part test of Rule

23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.[16] O'Keefe satisfies all four requirements.

#### 1. Numerosity

"The court must find that the class is 'so numerous that joinder of all members is impracticable.'" FED.R.CIV.P. 23(a). The proposed class consists of over 630,000 members. Joinder is impracticable.

#### 2. Commonality

Commonality requires that "there are questions of law or fact common to the class." FED.R.CIV.P. 23(a). This is not a terribly demanding standard because "[t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Baby Neal v. Casey,* 43 F.3d 48, 56 (3d Cir.1994), *quoted in In re Prudential,* 148 F.3d at 310. There are questions of law and fact in common to the class in the present case. Among them are:

(1) Whether the use of conventional motor oils when used in connection with extended oil drain intervals in FSS vehicles could result in oil sludging or related engine damage;

(2) Whether MBUSA failed to inform Plaintiff and class members of potential engine problems that could be associated with following or exceeding recommended service intervals using conventional oils;

(3) Whether MBUSA made express warranties relating to the FSS and its performance;

(4) Whether MBUSA breached express or implied warranties as a result of using conventional motor oil at FSS intervals; and

(5) Whether MBUSA conducted appropriate, reasonable and adequate pre-sale testing of its FSS equipped vehicles to determine the effectiveness of the system at the recommended FSS intervals;[17]

---

16. Rule 23(a) states:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will

fairly and adequately protect the interests of the class.

FED.R.CIV.P. 23(a).

17. Numbers one through five were complied using Pl.'s Post–Hearing Br., at 8 filed Jan. 22, 2003 [144–1]; and Def.'s Post–Hearing Br., at 4–5 filed Feb. 5, 2003 [150–1].

(6) All class members are asserting breach of express and implied warranty;

(7) All class members are asserting claims under their state's unfair trade practices or consumer protection law which have common elements;

(8) All class members argue in the alternative that New Jersey's Consumer Protection Statute applies to their claim, as discussed *supra* Section II n. 3.

The low threshold for commonality is satisfied because numerous factual and legal issues are common to all members of the class and class representative O'Keefe. *See Sanneman v. Chrysler*, 191 F.R.D. 441 (E.D.Pa.2000) (finding commonality when class alleged that car manufacturer did not disclose latent defects).

### 3. *Typicality*

▮ Rule 23 requires that the "claims of the representative party be typical of the claims of the proposed class." FED.R.CIV.P. 23(a). "The typicality requirement is designed to align the interests of the class and the class representatives so that the latter will work for the benefit of the entire class through the pursuit of their own goals." *In re Prudential*, 148 F.3d at 311 (citations omitted); *Cichonski v. American Inventors Corp.*, No. 95–CV–04079, 1995 WL 657107, at *3 (seeking "to ascertain that the interests of the class representatives are closely aligned with those of the class, so as to ensure fair representation of absentee class members."). The typicality test is not overly demanding. *See Sanneman*, 191 F.R.D. at 447; *In re Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214, 218 (E.D.La.1998). The typicality requirement may be met despite the existence of factual distinctions between the claims of the named plaintiffs and the claims of the proposed class. *See Baby Neal*, 43 F.3d at 58; *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir.1985).

O'Keefe's claims are typical of the class claims. O'Keefe and the class are asserting the same legal claims. O'Keefe and the class members were all allegedly injured by the same allegedly fraudulent behavior on the part of MBUSA. This is identical to the *In re Prudential* case where the named class representatives and the class members all suffered from the defendant's fraudulent scheme. *See In re Prudential*, 148 F.3d at 311. "Commentators have noted that cases alleging the same unlawful conduct which affects both the named plaintiffs and the punitive class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims." *Baby Neal*, 43 F.3d at 58 (finding defendant's scheme to ignore federal law fulfilled typicality requirement because the named plaintiffs did not have a "unique interest" separating them from absent plaintiffs), *quoted in In re Prudential*, 148 F.3d at 311. O'Keefe is typical of the class because he allegedly suffered from the same fraudulent behavior as other class members. *See Sanneman*, 191 F.R.D. at 447–48 (finding typicality when named plaintiff and class members all claimed to have been injured by car manufacturer's failure to disclose a latent defect). Moreover, O'Keefe and most class members have suffered or are at risk of suffering similar engine damage.

### 4. *Adequacy of Representation*

▮ This requirement is actually a two-part requirement. "First, the adequacy of representation inquiry 'tests the qualifications of the counsel to represent the class.' " *In re Prudential*, 148 F.3d at 312 (quoting *In re GMC Truck*, 55 F.3d at 800). "Second, it 'serves to uncover conflicts of interest between named parties and the class they seek to represent.' " *Id.* (quoting *Amchem*, 521 U.S. at 594, 117 S.Ct. 2231).

First, class counsel is highly skilled. Both Kenneth Jacobsen and Francis Farina have provided this court with their resumes. Jacobsen has had extensive experience dealing with multi-million dollar class actions relating to consumer protection, antitrust, environmental law, and securities litigation. They have both displayed their skill to this court through their well researched, argued and written briefs. They have developed an extensive factual record to support their client's allegations and legal arguments. Moreover, they displayed their skill to opposing counsel during long and tense negotiations. At the Dec. 20, 2002 hearing, plaintiff class counsel was described as "tenacious" in negotiations

and fighting "tooth and nail" over the legal issues. *See* Reiskin Argument, Tr. of Dec. 20, 2002 at 189 & 256. O'Keefe's legal counsel provided more than adequate representation to the class by vigorously pursuing the class's claims.

Second, O'Keefe adequately represents the class. O'Keefe suffered from the same alleged MBUSA scheme as the other class members. To prevail, O'Keefe, like the class members, would have the burden of demonstrating this scheme in court. His interests do not differ from the interests of the class members. The settlement demonstrates his unity with the class. By its terms, O'Keefe will not receive more compensation than other class members. His position in the settlement, like his position in the litigation, is not antagonistic to the other class members. *See In re GMC Truck,* 55 F.3d at 798 ("Courts adopting this approach require proof only that named plaintiffs' and class interests are not antagonistic.") (citations omitted); *Samuel–Bassett v. Kia Motors Am., Inc.,* 212 F.R.D. 271, 279 (E.D.Pa.2002) (same) (citing *Weiss v. York Hospital,* 745 F.2d 786, 811 (3d Cir.1984)). MBUSA concedes that O'Keefe adequately represents the class. MBUSA's counsel, Reiskin, stated at oral argument: "Although Mr. O'Keefe did not testify today, he's certainly been a more than adequate class representative. We don't dispute that." *See* Tr. of Dec. 20, 2002 at 189.

O'Keefe has fulfilled the requirements of Rule 23(a). The class is too numerous, such that joinder is impractical. O'Keefe's claims have issues of law and fact in common with the class. O'Keefe's claims and allegations are typical and not antagonistic to the absent class members. O'Keefe and the class counsel adequately represent the class.

---

**18.** Rule 23(b)(3) states in pertinent part:
 (b) **Class Actions Maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition: ...
 (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the

## B. Rule 23(b)(3)

Classes where common legal and factual issues predominate over individual issues may be certified under Rule 23(b)(3).[18] After a court finds that the proposed class complies with Rule 23(a), Rule 23(b)(3) requires the district court to "make two additional findings: predominance and superiority." *See In re Prudential,* 148 F.3d at 313. "Issues common to the class must predominate over individual issues, and the class action device must be superior to the other means of handling the litigation." *Id.* at 313–14.

### 1. Predominance

■ The predominance test of Rule 23(b)(3) is more demanding than Rule 23(a)'s commonality requirement. *See Amchem,* 521 U.S. at 623–24 & n. 18, 117 S.Ct. 2231. Yet, "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud...." *Id.* at 625, 117 S.Ct. 2231. For a settlement class action, the Rule 23(b)(3) "inquiry trains on the legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement." *Id.* at 623, 117 S.Ct. 2231.

■ We have already listed numerous legal and factual issues that are common to the class *supra* Section III.A.2. We now find that these common issues predominate over the class member's individual issues. Individual issues may be present and "class members need not be identically situated as to all issues, so long as their claims are not in conflict with each other." *See Kline v. Security Guards, Inc.,* 196 F.R.D. 261, 272 (E.D.Pa.2000).

Several individual factual and legal issues exist including:

 findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

(1) Personal Use: Whether differing driving habits contributed to the damages; and

(2) Damages: Whether each engine sustained damage or signs of future damage; and whether the damage is associated with the use of conventional motor oil at FSS recommended drain intervals; and

(3) Reliance: Whether individual class members heard or saw any FSS advertisements or promotional material, and whether the FSS system was relevant to an individual's decision to purchase the vehicle.[19]

We find that liability issues common to all class members predominate over any individual differences. There is one core liability issue that dominates this case and predominates over any class member's individual circumstances. MBUSA is accused of failing to inform its customers about the risks of using conventional oil under the FSS's extended oil drain intervals, and actively concealing that risk. Such a scheme common to all plaintiffs predominate over individual issues. *See In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 248 (D.Del.2002) (finding that "the allegedly deceptive practices of the defendant" predominated over individual issues); *Samuel–Bassett*, 212 F.R.D. at 282 (finding that the common design defect present in all vehicles at issues predominate over

individual issues); *see also In re Prudential*, 148 F.3d at 314–15 (finding that the common scheme arising out of allegedly deceptive trade practices predominated over individual issues of reliance and damages). The present case is a typical consumer fraud case where liability issues predominate. *See Amchem*, 521 U.S. at 625, 117 S.Ct. 2231.

This case is unlike our prior 23(b)(3) automobile defect class action case, *Sanneman v. Chrysler Corp.*, 191 F.R.D. 441 (E.D.Pa.2000) (Van Antwerpen, J.). The *Sanneman* plaintiffs alleged that Chrysler concealed a latent defect that caused the top coat of paint to chip off some vehicles. In *Sanneman*, this court found that individual issues predominated over common issues when the vehicles comprised "at least eight model years, 13 different manufacturing plants and hundreds of different kinds and colors of paint supplied by two different paint companies." *Id.* at 449–50. In the present case, the class consists of only a few car designs produced in a three and one-half year period using one allegedly defective component—the FSS. This is a far cry from the *Sanneman* case where we worried that certification of a litigation class would require a mini-trial to decide who were members of each sub-class.

Individual issues of product use, damages and reliance do not predominate over the

**19.** We do not include the differences in state laws because manageability issues are irrelevant for certifying a settlement class. *See Amchem*, 521 U.S. at 593, 117 S.Ct. 2231. Differing state law would complicate jury instructions, but this is a manageability complication that may be solved by categorizing sub-class of similar state laws for trial purposes. *See, e.g., In re Simon II Litig.*, 211 F.R.D. 86, 178 (E.D.N.Y.2002); *In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271, 292 (S.D.Ohio 1997) (considering several manageability solutions including "that state law variations can be categorized and then divided into subclasses"); *In re LILCO Sec. Litig.*, 111 F.R.D. 663, 670 (E.D.N.Y.1986) (doubting that differences in state laws were "so great as to preclude class treatment" and providing for the use of subclasses if necessary). This would create a handful of sub-classes for the jury to consider. *See, e.g., In re School Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir.1986) (affirming the grouping of state laws into four categories in a 23(b)(3) class); Larry Kramer, *Choice of Law in Complex Litigation*, 71 N.Y.U. L.REV. 547, 583 (1996) ("[T]here will never be 50 different substantive rules, or even fifteen or ten. States tend to copy

their laws from each other, and many use identical or virtually identical rules. In practice, the court will seldom have to deal with more than three or four formulations....").

In cases where certification was denied because of varying state laws in a nationwide class action, the courts have focused on the manageability problems. *See In re Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig.*, 288 F.3d 1012, 1018 (7th Cir.2002) (reversing certification of a nationwide litigation class and holding "[b]ecause these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable."); *In re LifeUSA Holding Inc.*, 242 F.3d 136, 146 & n. 10 (3d Cir.2001) (decertifying nationwide litigation class and stating that "[i]n *Prudential*, we affirmed the certification of a *settlement* class action" which "does not implicate trial management problems.") (emphasis in original); *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 461 (D.N.J.1998); *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 350 (D.N.J.1997) (denying 23(b)(3) certification, in part, because plaintiffs failed to create a trial plan for instructing the jury on the fifty various state laws).

liability issue for this settlement class. First, liability issues predominate over differing driving conditions when the class is not pursuing personal injury claims and the class alleges a design or manufacturing defect or deceptive scheme. *See Samuel–Bassett*, 212 F.R.D. at 282.[20] In the present case, issues regarding MBUSA's behavior predominate over the class member's driving habits. Plaintiffs allege that MBUSA misrepresented its product and failed to adequately research the FSS's performance before selling FSS equipped vehicles. Because MBUSA's behavior was uniform towards all class members, it predominates over class member's individual behavior.

Second, the necessity of individual damage calculations following a jury trial do not prevent certification under 23(b)(3) when common liability issues predominate over individual liability issues. Yes, individual damage calculations may require time and effort. Where the parties or the court can calculate the individual damages by an objective formula, the damages will not prevent certification.[21] *See Newton v. Merrill Lynch*, 259 F.3d 154, 187–89 (3d Cir.2001) (securities case stating that if plaintiff had "devise a formula that would measure damages among the class and serve as a plan for allocation," then common issues of fact and law would predominate over individual issues on the issue of damages, but denying class certification because individual issues on whether the class member was injured predominated over class issues) (citing *Amerinet v. Xerox Corp.*, 972 F.2d 1483, 1494 (8th Cir.1992) (antitrust case stating that proof of damage is separate from proof of the extent of damage)).

At this time, class counsel has not filed a proposed formula for dealing with damage

issues. And there are several damage issues which would complicate certification of a litigation class. First, class members own various vehicle models. Second, some class members have sustained serious damage requiring engine replacement or other costly repair services, while other class members may have suffered internal engine wear that is not readily apparent or quantifiable. However, we are certifying a settlement class and not a litigation class. It is appropriate to take the settlement into account to see how the settlement solves individual damage calculation problems. *See In re Diet Drugs*, 2000 WL 1222042, at *43 (E.D.Pa. Aug.28, 2000) ("[W]hen taking the settlement into consideration for purposes of determining class certification, individual issues which are normally present in personal injury litigation become irrelevant, allowing the common issues to predominate."); *see also Amchem*, 521 U.S. at 619, 117 S.Ct. 2231 (directing courts to consider the terms of the settlement when certifying a settlement only class). The settlement takes damages into consideration in two ways. MBUSA will refund class members who paid for repairs if the damages were "caused by the use of . . . conventional motor oil prior to December 2001 . . . ." Additionally, the Extended Coverage Program will insulate class members from future repair costs associated with the alleged conventional oil problems. Individual damage calculations will not occur and the court will not speculate on individual damage calculations.

Third, reliance is not a bar to class certification in this case. "Reliance is an issue secondary to establishing the fact of defendant's liability," because "all class members must establish the defendant's complicity and

---

**20.** Judge Joyner stated:
While Defendant is no doubt correct that each vehicle was driven differently by different drivers in different locations and that the vehicles manifested varying symptoms such as pulsating, grinding, vibration, and failure to stop, there is nonetheless more than sufficient indicia that a vast number of those [vehicles] manufactured and sold between 1995 and 2001 experienced some or all of the above symptoms and were subject to the wear-out of their brake pads and rotors before reaching the 5,000 mile mark *regardless* of who was driving them or where or how they were being driven.

*Samuel–Bassett*, 212 F.R.D. at 282 (emphasis in original).

**21.** Even when the district court finds that the individual calculation of damages could not be computed by a single objective standard, or when the individual damages turned on equity considerations, certification will not be defeated. In this case, the Third Circuit recommends certification of a liability only class under Rule 23(c)(4)(A). *See Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 137 (3d Cir. 2000) (citing *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir.1977)).

liability, thus, the individual issues are secondary and the class should be certified." *In re Prudential*, 962 F.Supp. 450, 511, 516 (D.N.J.1997) (citing Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 4.26, at 4–104 (3d ed. 1992) ("Challenges based on ... reliance have usually been rejected because [reliance pertains] to the right of a class member to recover in contrast to underlying common issues of the defendant's liability.")), *aff'd* 148 F.3d 283 (3d Cir.1998). As with the individual calculation of damages, the settlement agreement renders this manageability problem moot. If indeed MBUSA were to show that reliance issues complicated the case such that the liability issue did not predominate over individual reliance issues, we could certify a liability only class under 23(c)(4)(A). *See* text *supra* nn. 19 & 22. We find that liability issues predominate over individual issues for the O'Keefe settlement class.

### 2. Superiority

■ "The superiority requirement asks the court 'to balance, in terms of fairness and efficiency, the merits of a class action against those of "alternative available methods" of adjudication.'" *In re Prudential*, 148 F.3d at 316 (quoting *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 632 (3d Cir.1996) (quoting *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 757 (3d Cir.1974))). This case is clearly superior to individual suits because over 630,-000 claims are being handled at once. Each class member has relatively small claims that would not likely be litigated on an individual basis. The fact that parties do not know of any other similar claim filed against MBUSA testifies to the improbability of individually litigating these claims. The class action vehicle in this case will provide significant benefits to class members. This is in sharp contrast to pursuing their own negative value claims. *See In re Prudential*, 148 F.3d at 316 (finding the superiority requirement was met because the "relatively modest size of individual claims and the sheer volume of those claims in the aggregate"); *Samuel–Bassett*, 212 F.R.D. at 283 ("[I]n view of the fact that the class potentially numbers more than 10,000 and the relatively low cost of the car, we believe that a class action would be superior to and more efficient than adjudicat-

ing more than 10,000 individual lawsuits."); *Fry v. Hayt, Hayt & Landau*, 198 F.R.D. 461, 470 (E.D.Pa.2000) ("The efficiency of the class action vehicle is demonstrated in this case by the economic or practical impossibility of litigating several, small suits as compared to the eminently feasible alternative of litigating them together.").

Moreover, the settlement removes the manageability issues that would complicate this litigation. When courts find that a class action is not the superior method for adjudicating multiple claims, it is usually the case that the proposed class failed to meet the manageability requirement of Rule 23(a) or the predominance requirement of Rule 23(b)(3). *See In re Ford Motor Co. Ignition Switch Products Litig.*, 194 F.R.D. 484, 495 (D.N.J.2000) (finding class action not superior because the "Court found that common issues of law and fact do not predominate over individual concerns in this matter."); *Sanneman*, 191 F.R.D. at 454–56 (finding class action not superior because the case was unmanageable); *Chin*, 182 F.R.D. at 462 (finding class action not superior because class was unmanageable and individual issues predominated). This class possesses no manageability issue because it is a settlement only class. *See supra* note 19. In this case, common issues predominate over individual issues. *See supra* Section III.B.1. This class action is superior to pursuing thousands of individual claims.

### 3. The Class Will Be Certified

The proposed settlement class represented by O'Keefe satisfies the numerous, commonality, typicality, and adequacy of representation requirements of Rule 23(a). The proposed settlement class satisfies the predominance and superiority requirements of Rule 23(b)(3). We will certify the proposed class in the order accompanying this memorandum.

### IV. PROPOSED SETTLEMENT

Rule 23 class action settlements must be approved by the court. *See* FED.R.CIV.P. 23(e). The Third Circuit adopted the Second Circuit's *Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir.1974), as a guide to determine when a class action settlement should be approved. The *Girsh* factors are:

... (1) the complexity, expense and likely duration of the litigation ...; (2) the reaction of the class to the settlement ...; (3) the stage of the proceedings and the amount of discovery completed ...; (4) the risks of establishing liability ...; (5) the risks of establishing damages ...; (6) the risks of maintaining the class action through the trial ...; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery ...; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation....

*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) (quoting *Detroit*, 495 F.2d at 463). "These factors are a guide and the absence of one or more does not automatically render the settlement unfair. Rather, the court must look at all the circumstances of the case and determine whether the settlement is within the range of reasonableness under *Girsh.*" *See In re Orthopedic Bone Screw Prods. Liab. Litig.*, 176 F.R.D. 158, 184 (E.D.Pa.1997) (citing *Pozzi v. Smith*, 952 F.Supp. 218, 224 (E.D.Pa.1997)); *quoted in In re American Family Enterprises*, 256 B.R. 377, 417 (D.N.J.2000). We will also analyze this case under the Third Circuit's *In re GM* because one of the settlement's main components is a voucher.

### A. The Complexity, Expense and Likely Duration of the Litigation

■ The Third Circuit has stated that: This factor is intended to capture "the probable costs, in both time and money, of continued litigation." *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 801 (3d Cir.1974). By measuring the costs of continuing on the adversarial path, a court can gauge the benefit of settling the claim amicably.

*In re GM Corp.*, 55 F.3d at 812. The parties have saved vast amounts of resources by settling this litigation at this stage. If this case had gone to trial, it would have been long, expensive and risky for both parties. Trial preparations would have required additional extensive discovery and depositions. Certification of the class for trial would have been challenged by MBUSA which would have resulted in a round of expensive and timely interlocutory appeals. Even if the case then reached trial, Plaintiffs may not have prevailed at trial; or Defendant may have faced substantial punitive or treble damages. In either event, the losing party would have appealed and added additional delay and expense to both sides. *See In re IKON Office Solutions, Inc. Securities Litig.*, 209 F.R.D. 94, 104 (E.D.Pa.2002).

■ There are complex legal issues remaining, including: (1) a choice of law inquiry; (2) certification of a trial class;[22] (3) motions for summary judgment regarding state customer protection law, federal and state warranty law, common law fraud, and unjust enrichment; and (4) the difficulty that the class will face in establishing damages.

This factor weighs heavily in favor of the proposed settlement.

### B. The Reaction of the Class to the Settlement

■ The reaction of the class "is perhaps the most significant factor to be weighed in considering its adequacy." *Sala v. National R.R. Passenger Corp.*, 721 F.Supp. 80, 83 (E.D.Pa.1989). This factor "attempts to gauge whether members of the class support the settlement"[23] by looking at the "number and vociferousness of the objectors." *In re GM Pick–Up Truck*, 55 F.3d at 812.

#### 1. Opt–Outs

Here, only about 140 of over 667,000 class members have opted out.[24] *See* Def.'s Supp.

---

**22.** Certification of a settlement class must comply with all the requirements of a trial class except for whether the class would "present intractable management problems." *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Trial manageability would need to be litigated if settlement were not reached. If manageability were a problem, it may have resulted in bifurcated trial or the creation of sub-classes for trial.

**23.** *In re Safety Components, Inc. Sec. Litig.*, 166 F.Supp.2d 72, 85 (D.N.J.2001) (quoting *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 317 (3d Cir.1998)).

**24.** MBUSA places the figure at 141 opt-outs in mid-December 2002 and at 142 in early February 2003. *See* Def.'s Supplemental Memo. in Supp. of Final Approval, 7 filed Dec. 17, 2002 [132–1]; Def.'s Post–Hearing Br., at 18 filed on

Memo. in Support of Final Approval, at 2–8 filed Dec. 17, 2002 [132–1]; Def.'s Memo. in Support of the Joint Motion for Final Approval, at 8–9 filed Nov. 12, 2002 [97–1]; Pl.'s Post–Hearing Br., at 24–25 filed Jan. 22, 2003 [144–1]. Most of the opt-outs who submitted an explanation tended to object generally to class actions and lawyers. This is a tiny fraction of the class. Such implicit support of the settlement weighs heavily in favor of settlement.

### 2. Supporters

In addition to the overwhelming implicit support, Plaintiffs have filed copies of twenty-four letters written in support of the settlement and of class counsel's efforts. *See* Representative Communications from Class Members Supporting Settlement filed Nov. 12, 2002 [100–1]; Pl.'s Supplemental Compendium of Class Communications filed Dec. 5, 2002 [110–1]. This is a small percentage of the class and it is dwarfed by the number of class members who have not communicated with the court or the parties.

### 3. Objectors

There are three individual and one small group of formal objectors to the class action.[25] None raise objections that alter our certification of the class or our approval of the settlement. None of the objectors has enhanced the value of the settlement on the class's behalf. The objectors Yatooma and Pitts have merely submitted canned objections.[26]

Feb. 5, 2003 [150–1]. O'Keefe concurs with MBUSA's figure. *See* Pl.'s Post–Hearing Br., at 24–25 filed on Jan. 22, 2003 [144–1].

**25.** There were several other withdrawn objections in this case.

**26.** Federal courts are increasingly weary of professional objectors:

[S]ome of the objections were obviously canned objections filed by professional objectors who seek out class actions to simply extract a fee by lodging generic, unhelpful protests. . . .

*Shaw v. Toshiba Am. Information Sys., Inc.,* 91 F.Supp.2d 942, 973 (S.D.Tex.2000) (footnote omitted); *see In re Prudential,* 278 F.3d 175, *passim* (3d.Cir.2002) (upholding § 1927 sanctions against a vexatious professional objector);

#### a. Brian T. Regan

Regan has two objections. First, the $35 voucher is "not equitable." *See* Notice of Intention to Appear filed on Oct. 18, 2002 [83–1]. Second, Regan believes the $7.5 million request for attorney's fees is incongruent to the relief secured for each plaintiff. *Id.* He does believe that class counsel should be "compensated for the time spent on this case." *Id.*[27]

In response, Regan seems to have misunderstood the settlement's true relief to the class. The settlement is the voucher *plus* the Extended Coverage Program. Regardless of the Extended Coverage Program's monetary value, it is the core relief offered to the class because it insulates the class from out of pocket expenses associated with the alleged FSS defect.

On the topic of attorney's fees, we agree with Regan in part. Regan's misunderstanding of the relief obtained clouds his argument regarding attorney's fees. Class counsel secured more than simply a $35 voucher and class counsel's work should be considered in relation to the total relief obtained. On the other hand, we too agree that $7.5 million is excessive. As discussed *infra* Section V, we will not award $7.5 million.

#### b. Sheryl L. Dudley

Dudley filed a letter with the this court that does not specifically relate to the settlement. Instead, Dudley attacks the merits of the case and class counsel with generic comments criticizing plaintiff's lawyers. She

*Lobatz v. U.S. West Cellular of California, Inc.,* 222 F.3d 1142, 1147–48 (9th Cir.2000) (labeling the objector a "spoiler" when objector challenged a denial of discovery regarding attorney's fees where settlement agreement placed attorney's fees on defendant and not class members); *Torrisi v. Tucson Elec. Power Co.,* 8 F.3d 1370, 1378 (9th Cir.1993) (labeling the objectors "spoilers" when only twenty of 113,000 class members objected and only two appealed the settlement's approval).

**27.** A similar letter of complaint was filed by Eugene F. Ahearn. *See* Letter from Ahearn to Clerk of Court of 11/11/02 [75–1]. Ahearn does not believe attorney's fees should be awarded because his car has not experienced "oil sludg" problems. *Id.* Our response to Regan covers our response to Ahearn.

does not specifically attack any portion of the settlement or class certification. Her only support for the alleged frivolousness of plaintiff's allegations seems to be her enjoyment of her two Mercedes–Benz vehicles. Dudley's objections are irrelevant.

### c. Nicole Yatooma

We are suspect of Yatooma's objections because: (1) Yatooma—herself an attorney—is represented by attorneys from Michigan, Kentucky and Pennsylvania; (2) one of her attorneys is a professional objector;[28] and (3) Yatooma has never put conventional motor oil in her leased 2000 Mercedes–Benz.[29] Yatooma provided a laundry list of objections to the settlement.

First, Yatooma claims that the proposed class is unfair, unreasonable and inadequate because synthetic oil costs more than conventional oil; and because class members may be "limited to where they can take their cars for oil changes." Objections to Class Action Settlement, at 1–2 filed on Nov. 1, 2002 [93–1] [hereinafter "Yatooma Br."].

In response, Yatooma does not provide evidence that synthetic oil costs vehicle drivers more than conventional motor oils on a per mile or per year basis. Yatooma assumes that synthetic oil costs more than conventional motor oil. Yes, a quart of synthetic motor oil change costs more than a quart of conventional motor oil. But the synthetic oil allows car owners to drive further and longer between oil changes. Perhaps the synthetic oil actually costs less over the vehicle's life. We don't know. At the end of the day, this is a settlement. If there is a cost difference between conventional versus synthetic oil over a vehicle's life, the parties have agreed to settle their claims without reference to the difference. The settlement does not need to provide the class with all the relief a jury may have rewarded.

The per quart cost of synthetic oil does not render the settlement unreasonable or inadequate.

Moreover, Yatooma's car has only used synthetic motor oil and is not at risk to the alleged defect at issue in this case. Yatooma does not even pay for synthetic oil changes because Yatooma's vehicle is covered by MBUSA's Maintenance Program for leased vehicles under which MBUSA bears the cost of routine service. See Tr. of Dec. 20, 2002, at 136–37.

Yatooma' allegation that the settlement limits where car owners may take their vehicle for oil changes is untrue. The settlement contains no such restriction and Yatooma does not cite any portion of the settlement for this proposition. This allegation is groundless.

Second, Yatooma claims the breath of the release is unfair and represents a windfall for the defendant. See Yatooma Br., at 2–3. Yatooma does not expand on this conclusory statement. This objection is not "specific enough or otherwise sufficient to serve as grounds for disapproval." In re IKON Office Solutions, Inc. Securities Litig., 209 F.R.D. 94, 105 (E.D.Pa.2002).

Third, Yatooma claims that the exclusion of prior owners or lessees is unfair, inadequate and unreasonable because prior owners may have paid for repairs but will not receive compensation under the terms of the settlement. See Yatooma Br., at 3. In response, prior owners and lessees are not members of the class and are not bond by the terms of the settlement. They may pursue their own claims or a separate class action. Moreover, the settlement is not directed at prior owners or lessees because they would not benefit from the Extended Coverage Program or the $35 voucher. Both

---

28. Yatooma's Kentucky counsel Robert W. Bishop was recently criticized—along with other objectors—by Judge Bartle in the Fen–Phen MDL case for requesting $2.75 million in attorney's fees. Objecting attorney's purported to enhance the settlement by convincing the parties to include an amendment to the settlement. However, the record showed that the amendment had been negotiated and included in the agreement by the parties prior to the objector's request. See In re Diet Drugs Prods. Liab. Litig., MDL No. 1203, Civ. A. No. 99–20593, at 29–31 (E.D. Pa. Oct. 3, 2002 Pretrial Order No. 2622).

29. MBUSA's service records show that Yatooma's vehicle was delivered with synthetic motor oil. MBUSA used synthetic motor oil in Yatooma's only recorded servicing. MBUSA covers the cost of all routine servicing—including oil changes—under the terms of Yatooma's lease. See Tr. of Dec. 20, 2002, at 136–37.

run with the vehicle's VIN number and not the owner or lessee.

Fourth, Yatooma argues that the settlement is unfair, inadequate and unreasonable "due to the conflicts between owners and lessees." *Id.* at 3–4. Yatooma claims that owners receive greater benefits under the settlement. We do not agree. The settlement does not favor owners over lessees. All 1998 and 1999 vehicle owners and lessees receive identical vouchers. Both owners and lessees receive protection under the Extended Coverage Program because both may choose to drive their vehicles over extended periods. A lessee and an owner may depart with their vehicle before the Extended Coverage Program expires. An owner may sell his or her vehicle. Likewise, both an owner and lessee may choose to drive the vehicle long past the expiration. A lessee may opt to purchase the vehicle at the end of the lease agreement. We see no conflict between owners and lessees because both may or may not continue to operate the vehicle until the Extended Coverage Program expires. The settlement protects current and future owners and lessees with equal force.

Fifth, Yatooma alleges that the settlement is unfair, inadequate and unreasonable because there is no specifically defined procedure for reimbursement for previous repairs. *Id.* at 4. The settlement creates an informal procedure for MBUSA to reimburse drivers for previous repairs. The settlement requires MBUSA to "err on the side of the Settlement Class Member" regarding a "legitimate dispute as to whether to provide" reimbursement. Global Class Action Settlement Agreement, at ¶ 11.1.6. If owners or lessees are dissatisfied with the outcome of a "look back" application, they are free to pursue compensation through the courts. They may bring an independent suit or a contempt proceeding before this court. The settlement does not release MBUSA from violations of the settlement agreement. *See* Tr. of Dec. 20, 2002: Reiskin Argument, at 193 (asserting that if "Mercedes says your claim is not related to the use of conventional oil," then "they can file a lawsuit" because "[t]heir

claims are not released" when the settlement's terms states that only "[c]laims that are released are those that relate to the use of conventional oil in FSS vehicles."). Moreover, MBUSA already has a warranty claims system. Yatooma does not explain why MBUSA's current warranty system would be inadequate for adding one more type of warranty claim to its coverage list. The settlement procedures are adequate and reasonable.

Lastly, Yatooma argues that "[i]n light of the deficiencies ..., the attorney's fees are excessive and also cause [sic] the proposed settlement to be unfair, unreasonable and inadequate." *See* Yatooma Br., at 4. As stated previously, we will not award attorney's fees of $7.5 million. However, we find no deficiencies in the settlement.

### d. The Pitts

The Pitts present conflicting objections. On the one hand, the Pitts object to subject matter jurisdiction and believe that thousands of individual lawsuits would be more appropriate. *See* Objector's Joint Supplemental Memo. Regarding Subject Matter Jurisdiction filed Mar. 10, 2003 [169–1]; Tr. of Dec. 20, 2002, at 221. On the other hand, the Pitts want to enhance the settlement by objecting to the settlement agreement. *See* Memo. Br. in Opp'n to Class Settlement filed Dec. 11, 2002 [123–1]; Tr. of Dec. 20, 2002, at 223–24. The Pitts are arguing against the entire settlement at the same time that they are attempting to force more concessions from MBUSA within the settlement. Having stated the odd posture of the Pitts' arguments, we turn to a detailed review of the Pitts objections made in their canned brief[30] and stated at oral arguments. Their subject matter jurisdiction objections which were addressed in Section II.B. *supra.* Like Yatooma, the Pitts have submitted a laundry list of objections. Some were timely made in their written brief. Other objections were added at the December 20, 2002 Settlement Hearing.

---

30. The Pitts' counsel John Q. Somerville admitted that his initial filing was an edited version of a canned brief. *See* Tr. of Dec. 20, 2002, at 220 ("I plead guilty to using an earlier brief...."). Somerville's eight page brief mysteriously refers the reader to arguments at "infra, pp 32–45." *See* Memo. Br. in Opp'n to Class Settlement, at 5 n. 5 filed on Dec. 11, 2002 [123–1].

First, the Pitts object to the settlement as unfair because the class will be awarded only $255 in relief for sustained damages of $18,900 to $29,700. The Pitts seem to imply that the settlement agreement will leave each plaintiff with a $18,645 to $29,445 monetary loss. The Pitts are comparing apples to oranges. The $255 figure represents the $35 coupon plus the class counsel's estimation that the Extended Coverage Program's *present* value is $220. The $18,900 to $29,700 is the potential *future* repair bill for an engine replacement caused by oil sludging. The warranty insulates class members from ever suffering the $18,900 to $29,700 loss. To accurately compare these figures, the Pitts should have multiplied the estimated damage amount by the probability of suffering the damage. The result equals the *present* loss expectation. Comparing the *present* values allows a correct comparison between present and future values. However, we don't know what the present expectation of future loss is because neither parties truly know the probability of extensive engine damage. The vehicles are still on the road and no accurate sampling has been conducted.

Moreover, the $220 figure is O'Keefe's estimation of the price the Extended Coverage Program would have cost the class members to purchase on the open market. It is not the exact amount of money that MBUSA will give a class member in the event of an engine failure caused by the use of conventional motor oil in an FSS equipped vehicle. Instead, MBUSA will repair the vehicle for the class member at no charge. We do not see how the Extended Coverage Program is inadequate.

Second, the Pitts object to the $7.5 million attorney's fee request. *See* Objector's Mem. Br. in Opp'n, at 3 [123–1]. Again, this figure will not be awarded. *See infra* Section IV.

Third, Horace W. Kynard—a Pitts objector—believes that notice was inadequate because he did not receive notice. *See id.* MBUSA has executed the notice process with diligence and professionalism. MBUSA mailed notice to 667, 544 potential class members. After MBUSA realized there had been

an error in the mailing, it acknowledged the mistake and re-mailed the notice to 281,156 class members pursuant to our Amended Case Management Order filed on October 29, 2002 [88–1]. We see no deficiency in the notice procedure. It seems that Kynard did not receive notice of the settlement hearing because he is the vehicle's second owner and he did not inform MBUSA that the vehicle changed hands.[31] The notice procedure does not violate the class member's substantive or procedural due process rights, and the Pitts do not cite any relevant authority holding that such a mailing fails constitutional muster.

Fourth, the Pitts claim that O'Keefe does not adequately represent the owners and lessees of vehicles bought or leased after March 2001. *See* Memo. Br. in Opp'n to Class Settlement, at 3 [123–1]. This argument is without merit because such owners and lessees are not class members. *See* Global Class Action Settlement Agreement, at ¶ 7 (defining class as owners and lessees of MBUSA 1998, 1999, 2000 or 2001 FSS equipped vehicles "first purchased or leased on or before March 31, 2001"). O'Keefe is not required to prove that he adequately represents non-class members.

Fifth, the Pitts make a conclusory remark that individual issues predominate over class issues. *See* Memo. Br. in Opp'n to Class Settlement, at 4 [123–1]. We disagree with reference to Section III.B.1. *supra* where we found that class issues predominated.

Sixth, the Pitts argue that state law issues render class certification inappropriate. *See* Memo. Br. in Opp'n to Class Settlement, at 4–6 [123–1]. Specifically, the Pitts believe that the state law warranty claims would be overly complex. *Id.* at 4–5. We acknowledge that instructing a jury on every element for each cause of action for every jurisdiction would present a manageability problem. However, manageability problems are not a relevant consideration in settlement only classes. *See* discussion *supra* n. 19 and Section III.B.2. Even if this were a manageability issue, we believe that class counsel would

---

**31.** The Pitts do not present an alternative plan for communicating the settlement to class members. Would the Pitts have required the parties

to undertake the Herculean and inordinately expensive task of combing each state's Department of Motor Vehicle records for ownership changes?

be able to create three or four sub-class which group together similar state laws. *See* discussion *supra* nn. 19 & 22.

Seventh, the Pitts claim the settlement is inadequate because future owners are left uncompensated. *See* Memo. Br. in Opp'n to Class Settlement, at 6 [123–1]. This is a misguided argument. The Extended Coverage Program runs with the vehicle. Future owners and lessees will be covered by the Extended Coverage Program.[32] The settlement is adequate.

Eighth, the Alabama objectors attack the release as overly broad because it releases personal injury claims. *See* Tr. of Dec. 20, 2002, at 215–18. This is not true because the release does not release personal injury claims. *See supra* n. 1 and accompanying text. As for other claims, this is a settlement. It is a give and take compromise. MBUSA would not agree to settlement where it was not released from claims. No right minded defendant would agree to such a settlement where no claims released.

Ninth, the Pitts decry the agreement for not compensating owners for an alleged diminution in value because of the alleged defect. *See* O'Keefe's original complaint included a prayer for relief for diminution in value. Class counsel investigated the issue and concluded that no evidence existed. *See* Tr. of Dec. 20, 2002 at 191–92. Class counsel is not required to pursue dead ends. Moreover, the Extended Coverage Program would combat any alleged diminution in value by protecting the vehicle owner's investment.

Tenth, the Pitts complain that the settlement does not provide adequate compensation for MBUSA vehicle owners who have already purchased an extended warranty. We understand that this settlement has less value for these customer. The settlement still provides these customers with additional benefits. They receive the $35 voucher, and the Extended Coverage Program offers coverage above and beyond their purchased extended warranty. MBUSA offers different extended warranties but the most extensive extended warranty provides up to eight years or 100,000 on an extensive array of repairs. By comparison, the settlement offers coverage up to ten years and 150,000 miles on one specific problem. The settlement provides longer coverage, while extended warranty provides broader coverage. Extended warranty customers benefit from the settlement, because of the settlement's longer coverage period. At the same time, settlement has not rendered their voluntary purchase redundant and wasteful because their Extended Warranty covered more maintenance issues.

Eleventh, like Yatooma, the Pitts attack the settlement for failing to provide a comprehensive claim review structure. Again, we do not find this to be a deficiency because class members who have been denied reimbursement may sue MBUSA directly. *See* Section IV.B.3.c.

None of the objectors have identified a reason for denying class certification or disapproving the settlement. Objectors have had no effect on the terms of the settlement or the Order accompanying this memorandum.

*C. Stage of the Proceedings and the Amount of Discovery Completed*

This factor "captures the degree of case development that class counsel have accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits o the case before negotiating." *In re GMC Truck,* 55 F.3d at 813, *quoted in In re Cendant,* 264 F.3d at 235.

---

**32.** Even if the warranty did not run with the vehicle, it would be the present owner who would find the settlement deficient—not the future owner. The future owner would simply pay less for the vehicle, knowing that the warranty terminated upon resale. Future owners would be compensated for the warranty's termination because the lower price would incorporate the lack of a warranty. Present owners would receive less value for the vehicle. *See* George

Akerlof, *Market for Lemons: Quality, Uncertainty and the Market Mechanism,* 84 Q.J. of Econ. 488–500 (1970) (discussing how information asymmetries regarding product quality cause behavior responses including offering warranties as a product quality signal); *cited by California Dental Ass'n v. F.T.C.,* 526 U.S. 756, 771, 119 S.Ct. 1604, 143 L.Ed.2d 935 (1999) (discussing quality and pricing asymmetries between doctors and patients).

As discussed *supra* Section IV.B.1., there is a substantial amount of work that both parties would need to complete in preparation for a trial. At the same time, both parties have conducted substantial discovery. Depositions of key witnesses were conducted and large numbers of documents were produced and reviewed. Class counsel reviewed warranty information, maintenance data, internal MBUSA documents and reports related to the FSS system and conventional oil problems, and external reports complied on behalf of MBUSA for its internal use. The case was pending for over one year before negotiations started. Parties familiarized themselves with the facts of the cases, such that they understand the facts and can accurately estimate the risks and rewards that a trial may bring. The parties have also familiarized the court with the facts of the case through their extensive and voluminous submissions to the court and by producing two witnesses for testimony at oral argument.[33] This factor weighs in favor of settlement because the parties were fully aware of the facts and their positions prior to beginning negotiations.[34]

**33.** The court heard testimony from plaintiff's expert witness Raymond Scott King of DJS Associates. Mr. King is an automotive engineer. King gave a presentation on oil lubrication and the potential damage that the FSS system could cause when using conventional motor oil. The court also heard testimony from plaintiff's expert witness Mark Johnson. Mr. Johnson is an actuary. He testified on the value of the settlement's warranty provision to the class. Both King and Johnson were cross-examined by counsel for MBUSA, Objectors Pitts, and Objectors Haberbergers.

**34.** This factor overlap's Rule 23(a)(4) requirement that the plaintiff adequately represents the class. The Rule 23(a)(4) inquiry often spills over into an analysis of the class counsel's ability to represent the class. Both inquiries monitor the class counsel's ability. Ensuring that the settlement is negotiated only after the parties—and particularly class counsel—have reviewed the facts and legal issues involved in the case helps confirm that class counsel has adequately represented the class throughout the proceedings and the settlement negotiations.

**35.** Judge Katz's recent opinion in *In re IKON* warned that the court should remember that this factor does not seek to analyze actual liability for trial purposes:

> [I]f it appears that further litigation would realistically risk dismissal of the case on summary judgment or an unsuccessful trial verdict,

### D. Risks of Establishing Liability

"A court considers this factor in order to 'examine what the potential rewards (or downside) of litigation might have been had the class counsel decided to litigate the claims rather than settle them.'" *In re Cendant*, 264 F.3d at 237 (quoting *In re GMC Truck*, 55 F.3d at 814.). While this is an important factor under the *Girsh* balancing test, the court should not use this factor to conduct a mini-trial on the merits of the case.[35]

We note that Plaintiff has laid out persuasive arguments against MBUSA for allegedly violating express and implied warranties, and violating state consumer protection laws. MBUSA claims that liability will not be established if the case goes to trial. Neither party has truly briefed the issue of liability because no summary judgment motions were filed in this case. The risks of establishing liability does not favor or disfavor settlement.

### E. Risks of Establishing Damages

Establishing damages is the weakest link in the plaintiffs' prima facie case.[36] There

> it is in the plaintiffs' interests to settle at a relatively early stage. In contrast, if it appears that liability is extraordinarily strong, and it is highly likely that plaintiffs would prevail at trial, settlement might be less prudent. On this issue, the court should avoid conducting a mini-trial and must 'to a certain extent, give credence to the estimation of the probability of success proffered by class counsel, who are experienced with the underlying case, and the possible defenses which may be raised to their causes of action.'

*In re IKON*, 209 F.R.D. at 105–06 (quoting *Lachance v. Harrington*, 965 F.Supp. 630, 638 (E.D.Pa.1997) (approving settlement after motions for summary judgment were decided)).

**36.** Both factors four and five relate to the prima facie case. To prevail on their UTPCLP claim, the class must prove by clear and convincing evidence that:

> (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and
> (6) the resulting injury was proximately caused by the reliance.

*Blumenstock v. Gibson*, 811 A.2d 1029, 1034 (Pa.Super.Ct.2002) (citations omitted).

are factual and legal impediments that class counsel will need to overcome to establish damages. The greatest challenge to establishing liability is the fact that the majority of class members have not yet experienced oil sludging in their engines. Instead, class members have been exposed to the risks that may cause oil sludging. Most class members may have internal excessive engine wear that may be hard to prove or quantify. Moreover, each engine is at a different level of risk because: (1) some class members used only synthetic oil; (2) class members changed oil at different drain intervals; and (3) certain 2000 and 2001 vehicles were not at risk of oil sludging.

Legally, some members of the class may not be entitled to damages under their state warranty claims or state consumer protection claim. Some state statutes may require that their individual vehicle experience actual defects in order to recover relief and not merely be at risk of defects. *See Chin v. Chrysler Corp.,* 182 F.R.D. 448, 460 (D.N.J.1998) ("In most jurisdictions, the courts recognize that unless a product actually manifests the alleged defect, no cause of action for breach of express or implied warranty or fraud is actionable."). Plaintiffs face a difficult task of factually and legally establishing damages. On the other hand, if the class were to overcome the legal complexities and convince a jury that damages were sustained, then MBUSA may be exposed to a large jury verdict. This issue weighs heavily in favor of settlement.

### F. Risks of Maintaining the Class Action Through the Trial

We agree with MBUSA, that this factor need not be addressed following the Supreme Court's *Amchem* decision. *See In re Prudential,* 148 F.3d at 321.[37] We merely note that the class is very homogenous for a class action. We foresee few if any manageability problems because: (1) there is one alleged defect; (2) all class members are claiming the same allegedly fraudulent behavior caused their injuries; (3) a resulting defect

requires similar engine replacement for the affected class members; and (4) this case does not involve personal injury.

### G. Ability of the Defendant to Withstand a Greater Judgment

This factor is neutral for this settlement, because it is not applicable to the facts of this case. The defendant's ability to withstand a greater judgment is only relevant when a reasonable estimate of a judgment would move the defendant towards a critical financial threshold, *i.e.* forcing the defendant to file bankruptcy. This factor seems most appropriate in either limited fund class actions under Rule 23(b)(1)(B), or when the defendant faces large verdicts in multiple cases. Where a defendant has resources to pay a larger judgment, courts often accord this factor little weight. *See GMC Truck,* 55 F.3d at 818 (agreeing with district court determination that although defendant could withstand a greater judgment, no significance would be attributed to this factor); *Lazy Oil Co. v. Witco Corp.,* 95 F.Supp.2d 290, 318 (W.D.Pa. 1997) (presuming defendants would have resources to withstand greater judgment but according factor little weight in light of risks that plaintiffs would not be able to achieve greater recovery at trial). "This factor does not require that the defendant pay the maximum it is able to pay." *In re Diet Drugs,* 2000 WL 1222042, at *62 (E.D.Pa. Aug.28, 2000) (citing *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 148 F.3d at 321–22 (finding that defendant's declining credit rating during litigation supported settlement)). Placing undue emphasis on this factor when the defendant is financially stable may lead to the disapproval of appropriate, fair and reasonable settlements.

For example, the Third Circuit in *In re Cendant* was concerned with the defendant's ability to pay because it was approaching bankruptcy. Plaintiffs had sought $8.8 billion in damages, but settled the case for $2.85 billion. The court went on to say that the factor weighted against settlement because

---

**37.** The Third Circuit stated that:

[W]e pause to comment on the application of this factor in 'settlement-only' class actions following the Supreme Court's decision in *Amchem.* Because the district court always pos-

sesses the authority to decertify or modify a class that proves unmanageable, examination of this factor in the standard class action would appear to be perfunctory.

*In re Prudential,* 148 F.3d at 321.

the defendant could sustain a higher penalty, but that if the entire $8.8 billion was awarded then the defendant would have entered bankruptcy. *See In re Cendant*, 264 F.3d at 239–41. In the present case, MBUSA is not facing bankruptcy.

In the Second Circuit's *Detroit v. Grinnell Corp.*—where the *Girsh* factors originated—the court discussed the defendant's ability to withstand a greater judgment because the defendants were facing multiple suits. Defendants had paid a prior twelve million dollar judgment, agreed to settle the present case for ten million and still faced additional multi-million dollar antitrust suits. *See Grinnell Corp.*, 495 F.2d at 467.

Neither of these concerns are present in this case. MBUSA would not approach bankruptcy because of these litigation claims and MBUSA is not facing multiple cases over the FSS system seeking high damage awards. This factor is neutral to settlement.

*H. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and the Range of Reasonableness of the Settlement Fund to a Possible Recovery in Light of All the Attendant Risks of Litigation*

"The last two *Girsh* factors ask whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial." *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d at 322. The settlement should represent a discount from the best possible judgment because the class is avoiding litigation risks. *Id.* The starting point for this analysis is the "economic valuation of the proposed settlement." *See In re Aetna Sec. Litig.*, No. MDL 1219, 2001 WL 20928, at *11 (E.D.Pa. Jan.4, 2001).

This has been the most contentious issue between the parties because the value of the settlement is directly tied to the attorney's fees.[38] For purposes of approving the settlement, we do not need an exact dollar amount.

This is the most contentious issue between O'Keefe and MBUSA. Both parties agree that the vouchers are worth $12.3 million to the class. However, they are about $100 million apart on the Extended Coverage Pro-

gram's valuation. While this argument is highly relevant to determining the attorney's fees because a district court is required to "determine a precise valuation of the settlement on which to base its [fee] award." *In re GMC Truck*, 55 F.3d at 822. For purposes of approving the settlement, an exact figure is not required to evaluate the settlement's non-monetary benefits. *See In re the Prudential Ins. Co. of Am.*, 962 F.Supp. 450, 540–41 (D.N.J.1997) (declining to place a specific value on either the "best possible recovery for plaintiffs in the aggregate" or the settlement's value to the class, because each class member's "recovery exceeds the value of the best possible recovery discounted by the risks of litigation."), *aff'd In re Prudential Ins. Co. of Am. Sales Litig.*, 148 F.3d at 322, 346; *see also Weiss*, 899 F.Supp. 1297, 1303–04 & n. 5 (D.N.J.1995) (using an approximation to establish the settlement's value), *aff'd Weiss v. Mercedes–Benz of N. Am.*, 66 F.3d 314 (3d Cir.1995) (unpublished).

Regardless of the present value of the Extended Coverage Program to the class, the program is specifically designed to meet the class's concerns. At this time it is unclear: (1) how many vehicles will experience oil sludging due to the use of conventional oil in FSS equipped vehicles; (2) how extensive the damage will be when discovered; and (3) at what mileage the damage will occur. This suit was brought after several thousand vehicles allegedly experienced the problem but while vehicles still at risk are on the road. A warranty system will ensure that no class member will suffer an out of pocket loss if the failure materializes in their vehicle. Under the settlement, MBUSA will reimburse class members who experienced oil sludging in their FSS equipped vehicles and have paid for the repairs. *See* Joint Approval, at ¶ 11.1.5.–11.1.7.

This settlement is highly tailored to the alleged damage that class members might suffer because it repairs the vehicles. This is unlike the *In re GM Truck* case where the settlement consisted of only a $1,000 voucher for the purchase of a future GM vehicle. The Third Circuit criticized the settlement because it "made no provision for repairing

---

**38.** Attorney's fees are discussed at length *infra* Section V.

the allegedly life-threatening defect" in the vehicles. *See In re GM Truck,* 55 F.3d at 806–07.

If Plaintiffs had gone to trial and if MBU-SA were found liable, damages may have equaled actual damages or even treble damages depending on the state where the vehicle was purchased. O'Keefe's Complaint, Amended Complaint and Second Amended Complaint do not list a specific dollar amount for the prayer of relief. Regardless of the figure, the Extended Coverage Program insulates class members from suffering actual damage.

The voucher provides the class members with a $35 discount off routine service. Therefore, the settlement provides actual damages plus thirty-five dollars to each class member. The value of the settlement to each class member represents a reasonable discount from the best possible judgment if they were to prevail after a trial.

## I. The Appropriateness and Fairness of the Voucher

Settlements that include a voucher require extra scrutiny because non-monetary settlements are a "prime indicator of suspect settlements." *In re GM Truck,* 55 F.3d at 803. As discussed briefly *supra* Section IV.B.8., the *In re GM Truck* district court approved a settlement where plaintiff class would release the defendant from all non-personal injury related claims in exchange for a $1,000 coupon "towards the purchase of any new GMC Truck or Chevrolet light duty truck." *Id.* at 780–81, 783. The Third Circuit overturned the decision and listed several factors to consider when evaluating the appropriateness of vouchers in consumer product class action settlements: (1) does the settlement repair the product; (2) does the voucher require unanticipated future dealings between the parties; (3) can all the class members use the voucher; (4) the price of the item that the voucher discounts; and (5) is there monetary relief if the voucher goes unused. *Id.* at 806–08. The Third Circuit noted that the $1,000 vouchers would only be used by class members who could afford a new truck and who wanted to purchase a new GM truck. The high price of a vehicle and the infrequency of vehicle purchases meant that not all class members could or would purchase a new

vehicle before the vouchers expired. Additionally, class members who did not want to enter into another long term contractual relationship with GM had no relief. GM tried to save the settlement by claiming that class members could sell the vouchers for monetary relief. The court was suspicious that a transfer market would develop for the vouchers. The court stated that the settlement was little more than "a sophisticated GM marketing program" to encourage future truck sales. *Id.* at 807.

The $35 voucher at issue here avoids all of the defects exhibited in the GM voucher. First, the Extended Coverage Program repairs the product's defects. Second, the voucher does not force unanticipated dealings between the parties. No class member will be forced to purchase a new vehicle and enter into a new long term contractual relationship with MBUSA. Third, all class members can use the vouchers. All vehicles need an oil change eventually and all vehicle owners anticipate oil changes. All class members will be given a voucher and they can all use the voucher. Fourth, an oil change is an inexpensive routine service. It is not like purchasing a new vehicle which requires a large investment. The oil change's price is not so high as to prohibit any class member from redeeming the voucher. Fifth, all vehicle owners have the ability to use the voucher and would not need to resort to a transfer market for monetary relief.

The $35 voucher is an appropriate part of the O'Keefe settlement. It is not a MBUSA marketing tool. The best feature of the voucher that weighs in favor of approving the settlement, is that the voucher does not stand alone. The Extended Coverage Program ensures that the vehicles are repaired and that class members do not suffer a financial loss. Unlike *In re GMC Truck* where the voucher constituted the sole form of relief, the $35 voucher is the minor component of the O'Keefe settlement.

The settlement agreement will be approved because it is adequate, fair and reasonable for all class members. The *Girsh* factors clearly favor settlement. The voucher is a reasonable and fair component of the settlement. O'Keefe and the class counsel

304

had represented the class well. The settlement came after heated arms-length negotiations.

## V. FEES

■■■ Courts do not want the attorney's fee award to turn into an mini-trial. Unfortunately, such a result has happened in this case. The parties have taken staunch opposing views on attorney fees. Class counsel requests a fee award of about seven million dollars plus costs. MBUSA believes $950,00 to $1,500,000 plus some costs is appropriate. We believe neither award is in order. We believe the settlement is worth $32,645,220.00 to the class members according to our best estimation. We will award counsel fifteen percent of the recovery: $4,896,783.00.

### A. Percentage of the Common Fund Created

The parties and the court are well aware of the demise of the pure lodestar method because it encouraged inefficient behavior, turned judges into bean counters and created antagonistic interests between the class and class counsel. *See, e.g., Third Circuit Task Force: Court Awarded Attorney Fees,* 108 F.R.D. 237, *passim* (1985); *see also Blum v. Stenson,* 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) (casting doubt on lodestar); *In re Cendant Corp. Litig.,* 264 F.3d 201, 256 & n. 32(3d Cir.2001) (criticizing lodestar for taxing the judiciary, mis-aligning class and counsel interests; providing an extensive reading list to consider the percentage-of-recovery method); *In re GM,* 55 F.3d at 821 (faulting lodestar for failing to align class and class counsel interests); *Matter of Continental Illinois Securities Litig.,* 962 F.2d 566, 572–72 (7th Cir.1992) (Posner, J.) (criticizing lodestar).

The Third Circuit promotes the use of the percentage-of-recovery method in common fund cases. *See, e.g., In re Cendant,* 243 F.3d at 733–34; *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 195 n.1 (3d Cir.2000); *In re Prudential,* 148 F.3d at 333–34; *In re GM,* 55 F.3d at 821. The Third Circuit also recommends using a less exacting version of the lodestar to cross-check the fee award's reasonableness. *See In re Cendant,* 264 F.3d at 256–57; *Gunter,* 223 F.3d at 195 n. 1.

Our attorney fee award decision will incorporate the seven factor *Gunter* test that the Third Circuit mandates and the lodestar cross-check. *See In re Cendant,* 243 F.3d at 734 (chastising the district court judge for failing to do a *Gunter* analysis and recommending the lodestar cross-check).

Plaintiff counsel fully agrees with this method. MBUSA disagrees. It advocates the "petite lodestar" method described in *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.,* 886 F.Supp. 445 (E.D.Pa. 1995). We decline to follow the letter of the law laid down in *Unisys* for three reasons. First, in the eight years since the opinion's publication, no other court seems to have adopted its method. Second, the Third Circuit mandates the seven factor *Gunter* test. Third, we believe that the *Gunter* test incorporates the same concerns expressed in *Unisys* and both tests would arrive at about the same fee award. We do not believe that the two tests are materially different.

### B. Valuation

■■■ When class counsel secures a common fund on the class's behalf, equity requires the class to pay counsel a portion of the fund. *See Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980) ("[A] litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."). This protects against the class's unjust enrichment at the expense of its agent. *Id.* ("[P]ersons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful litigant's expense.").

The settlement fund should be based on the benefit to the class and not the cost to the defendant. *See Prudential,* 962 F.Supp. 450, 557 (D.N.J.1997) ("[T]he cost of the relief to Prudential is not the measure of the class member benefit. The value of the relief to the class, which may be substantial, is what matters."), *aff'd* 148 F.3d 283; *Weiss v. Mercedes–Benz of N. Am.,* 899 F.Supp. 1297, 1304 (D.N.J.1995) ("The Court determines that a percentage of the value of the settlement to the class is the appropriate method

for calculating counsel fees."), *aff'd* 66 F.3d 314 (3d Cir.1995) (unpublished). By tying the counsel's fee to the class's relief, we ensure that the counsel works for the benefit of the class. If we were to base class counsel fees on the costs inflicted on the defendant, strange results might arise. Class counsel would have an incentive to seek excessive injunctions—that provide little relief to the class—against the defendant just to increase their court awarded fee.

### 1. The Voucher

The parties agree that the vouchers are worth $12,300,365 to the class. We agree. The vouchers have a face value of $35. There are 351,439 class members who will receive the vouchers. A simple multiplication yields $12,300,365.00.

### 2. The Extended Coverage Program

The parties strenuously contest the Extended Coverage Program's valuation. The parties have submitted a total of four different valuations. One is from O'Keefe, and three from MBUSA. After the parties reached settlement, the parties each submitted one valuation. O'Keefe submitted a valuation by Scott King. MBUSA submitted a valuation by Dr. George Eads. We found Dr. Eads's report unrelated to the settlement's valuation because it measured the common fund by MBUSA's costs and not by the benefit the class.[39] We believe that the benefit to the class are most accurately measured by making an estimation of the Extended Coverage Program's market price. We realize that this figure is difficult to estimate because the Extended Coverage Program—or any similar warranty product—is not on the market. Yet, economists, actuaries, investors and businesspeople must estimate and value risk in all types of market transactions. A warranty is simply the ex ante market price of insuring against a foreseeable risk. Any other measure except the market price

would over or underestimate the benefit to the class.

After reviewing the expert valuations and the accompanying briefs, we ordered MBUSA to submit a new valuation figure. *See* Order filed on Feb. 10, 2003 [152–1]. The Order stated that:

> Defendant Mercedes–Benz USA, LLC **SHALL** file no later than Wednesday February 26, 2003 an expert's valuation that uses actuarial methods to estimate the ex ante price that the proposed "Warranty Coverage"[40] would have cost class members to purchase; . . . .

*Id.* In accordance with our Order, MBUSA submitted the Affidavit of Frederick W. Kilborne. *See* Substitution of Original Aff. filed on Feb. 27, 2002 [164–1]. MBUSA stated in its accompanying letter, that its submission of the Kilborne Affidavit "does not concede that the engine coverage feature of the proposed settlement is tantamount to an extended warranty, or that an actuarial approach to valuation is necessary." Kilborne's Affidavit contains two valuations. In Appendix E, Kilborne recalculates Johnson's valuation by augmenting the model's assumptions. In Appendix F, Kilborne provides his own valuation. As expected, each valuation has its strong and weak element. We will briefly review each valuation.

#### a. Johnson Valuation[41]

Johnson provides a simple valuation based on alterations to MBUSA's extended warranty. The Tillinhast–MBUSA's seven year/100,000 mile extended powertrain warranty is priced at $658. Johnson firsts multiplies this figure by 1.75 to convert it into a ten year/150,000 warranty. He adds seventy-five percent even though the duration is 42% longer and the milage is 50% longer because the warranty's coverage period is not linearly correlated with repair costs. As a vehicle ages, the repair bills increase. More warranty claims are filed towards the tail end of a

---

**39.** Realizing how prior cases are used to attack expert witnesses, we would like to note that we do not believe that Dr. Eads submitted a deficient report. His report was thorough, but unhelpful because Dr. Eads was asked to answer a slightly different question than we are attempting to resolve.

**40.** *See* Global Class Action Settlement Agreement, at ¶ 11.

**41.** *See* Aff. of Mark Johnson filed under seal on Aug. 7, 2002 [61–1]; Redacted Aff. Of Mark Johnson filed Aug. 30, 2002 [65–1]; Rebuttal Aff. Of Mark Johnson filed on Mar. 3, 2003 [166–1].

warranty. Therefore, as the warranty coverage period lengthens, the repair costs rise exponentially.

Second, Johnson multiplies by 0.15 because he believes that 15% of a powertrain warranty's coverage is devoted to "internally lubricated engine claims." Aff. of Mark Johnson filed under seal on Aug. 7, 2002 [61–1].

Third, Johnson multiplies by 1.5 because he believes that MBUSA's American cars are three to four times more likely to experience the oil sludging problem than cars sold in the rest of the world. This assumption is based on information filed under seal, and we believe how Johnson's expert opinion lead him to the figure.

Lastly, Johnson adds a $25 administrative fee for paying an outside party to handle the claim processing. This results in valuing the Extended Warranty Coverage at $284.09 per vehicle for a total of $119,700,000.

We believe that Johnson methodology is generally correct. In our laymen review, we believe this overestimates the value in two crucial ways. First, the $25 administrative fee is duplicative. Surely the starting $685 price tag for a powertrain warranty includes the administrative costs relating to processing claims April 2, 2003. Second, we do not see the need for including the 1.5 multiplier because American vehicles experience the problem more than vehicles in the rest of the world. We believe that the original $685 price was particular to MBUSA's American market. Johnson has not explained why the $685 starting price did not already incorporate problems unique to the American market. Third, realizing that all actuarial estimations include assumptions, we are reluctant to endorse Johnson's 0.15 multiplier. At the same time, we are hardly in a position to choose a better multiplier.

### b. Eads Valuation [42]

Eads took a different approach to estimation. He investigated past MBUSA warranty data related to the alleged defect at issue in this case. Eads concludes that the Extended Warranty Coverage will cost MBUSA

$4.1 million in reimbursements to dealers for servicing "conventional-oil-related engine problems." He concludes that the figure is likely to cost MBUSA zero in additional costs because MBUSA would have likely covered all "conventional-oil-related engine problems." Eads criticizes Johnson for not using costs as a starting point in his analysis. We do not believe that Eads's analysis is relevant to valuing the benefit to the class members. It reads more like a document aimed at placating DiamlerChrylser shareholders. First, this court must value the benefit to the class. The cost to MBUSA is irrelevant. Second, Eads did not take into account out of warranty repairs or repair at third-party garages. His analysis under estimates the number of repairs related to the use of conventional oil at FSS drain intervals. Third, how can this court be sure that MBUSA would have covered all "conventional-oil-related engine problems" under goodwill for the next ten years? Goodwill is a real factor that should be considered in the business world. However, it does not secure the legal right for class members to request vehicle maintenance. We ordered Defendant to submit an additional valuation so that we would not have to critique Johnson's Affidavit in a vacuum.

### c. Kilborne's Augmentation of Johnson [43]

Kilborne critiqued Johnson's valuation and recalculated it. First, Kilborne believes that Johnson's 1.75 multiplier was actually too low. Instead, Johnson used a multiplier of between 1.7 to 2.1 for the various MBUSA vehicle classes. We have no reason to disagree with Kilborne's adjustment.

Second, Kilborne criticizes Johnson for making an educated guess that 15% of the powertrain warranty covers "internally lubricated engine claims." Kilborne finds little merit in Johnson's 1.5 multiplier because it lacks support. He replaces both Johnson multiplies with one multiplier. Kilborne replaces them with multipliers of 0.084 for M-

---

42. *See* Decl. of Keith Heinold, Ex.: K: Supplementary Expert Report of Dr. George C. Eads filed on Oct. 15, 2002 [78–1]; *Id.* Ex.: L: Expert Report of D. George C. Eads.

43. *See* Substitution of Original Aff.: App. E filed on Feb. 27, 2003 [164–1].

class vehicles and 0.014 for all other vehicles. Kilborne's multiplier suffers from some of the same defects as Eads's valuation because Kilborne derives his multipliers from MBUSA's deficient warranty records.

Kilborne also challenges Johnson's $25 administrative fee. He removes it from the calculation and we agree with this decision. Kilborne recalculates Johnson's formula and arrives at a $20,353,855 total valuation or $48.31 per vehicle (Kilborne actually calculates different values for each vehicle class).

We believe that Kilborne's estimates are more accurate than Johnson's. However, we believe that it is still deficient because he used MBUSA's warranty data set to derive his multiplier. We believe that the real multiplier is between Kilborne's 8.4% and 1.4% and Johnson's 22.5%. (The 22.5% is simply the multiple of Johnson's 0.15 and 1.5 multipliers.) Again, we will not hazard a guess the actual multiplier and substitute our laymen judgement for the experts' estimates.

### d. Kilborne Valuation [44]

Kilborne, like Johnson, attempts to price the Extended Warranty Coverage. Unlike Johnson, Kilborne takes into account the amount of time that each model year was exposed to conventional oil at FSS drain intervals. Kilborne assumed that all drivers ceased using conventional oil when MBUSA advised the owners and lessees to switch to synthetic oil. He also assumed that vehicles were driven an average of 12,000 per year and had their oil changed every 12,000 miles. These estimates seem fair. The 12,000 mile per year estimate comes from a third-party statistical survey. The 12,000 miles between oil changes is the average interval recommended by the FSS. Kilborne assumed that the risk of future damage "would be directly proportional" to the length of time that conventional oil was used. Kilborne estimated that the Extended Warranty Coverage benefits the class by $1.5 to $3 million. Specifically, Kilborne believes that the repairs would cost MBUSA $1.9 million and the aggregate market price would be $2.6 million. This is $6.17 per vehicle.

We believe that Kilborne's estimates are too low. First, we believe that the damage

would not be directly proportional to the exposure time. Kilborne does not explain his "directly proportional" assumption. Second, he underestimates the exposure time. He assumed that each model year entered service in that model year, i.e. 1999 vehicles entered service on or after Jan. 1, 1999. As many car buyers know, model years come out before the New Year. This would increase exposure time. Third, we are not so sure that vehicle owners switched to synthetic oil right after MBUSA advised them to do so. They may have simply waited to switch at their next oil change. Fourth, the $6.17 Extended Coverage Program figure seems hard to justify. When the potential damage is $18,900 to $29,700.

The four valuations are dispersed in part because they are based on differing factual assumptions that comport with each side's own version of the case. They are also dispersed because of differing methodological approaches. We believe that the best currently available reasonable estimate is Kilborne's augmentation of Johnson's formula: $20,353,855. We realize that this is not the true value and that it is most likely an undervaluation. However, it is the Class Counsel's burden of persuasion on this issue and they have not provided a more reliable estimate. We believe that Kilborne's augmentation of Johnson is the best available valuation because: (1) it uses a market price for a warranty as its starting point; (2) the $48.31 per vehicle price is not unreasonable; and (3) it attempts to confine its assumptions to available data and not broad speculation. It is superior to the Johnson estimation because it does not include the duplicative administrative cost or the assumed 1.5 multiplier for American vehicles. It is superior to the Eads valuation because the Eads only valued the costs to MBUSA. And finally, the augmented formula is superior to Kilborne's own valuation because its assumptions are more rational.

### C. The Gunter Test

 "A thorough judicial review of fee applications is required in all class action settlements." In re GM, 55 F.3d at 819; In

---

44. See Substitution of Original Aff.: App. F [164–1].

*re Cendant*, 243 F.3d at 730. District courts should consider at least seven factors in considering when awarding fees using the percentage-of-recovery method in common fund class actions:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

*Gunter*, 223 F.3d, at 195 n. 1; *cited by In re Cendant*, 243 F.3d at 733. This test seeks to guide us towards a reasonable and fair fee award in light of the case's particular circumstances. We will now review each factor in turn.

### 1. The Size of the Fund Created and the Number of Persons Benefitted

■ In general, as the size of the award increases, the percentage of recovery decreases. *See In re Prudential*, 148 F.3d at 339. "The basis for this inverse relationship is the belief that '[i]n many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel.'" *Id.* (quoting *In re First Fidelity Bancorporation Securities Litig.*, 750 F.Supp. 160, 164 n. 1 (D.N.J.1990)). The $32,645,220 valuation is not in the mega-fund range. Neither party places much reliance on this factor. It is neutral to our decision.

As for the class size, the parties have not submitted examples of other class sizes for comparison. This factor is neutral to our inquiry.

### 2. The Presence or Absence of Substantial Objections by Members of the Class to the Settlement Terms and/or Fees Requested by Counsel

There were no substantial objections to the settlement. The objectors' comments had no affect on our decision or the settlement agreement. The settlement was reached before the objectors weighed in and the settlement was not altered in response to the objectors.

Most of the objectors stated that the attorney fee request was unreasonable in light of the settlement. None submitted an alternative fee proposal. We did not award the entire fee request. Therefore, we believe that the objectors concerns have been addressed. This factor weighs in favor of the fee we will award.

### 3. The Skill and Efficiency of the Attorneys Involved

This factor is neutral to our fee decision. We believe that skill is already incorporated into the fee award, because it was class counsel's skill that obtained the relief. The class counsel is highly skilled and experienced in class action lawsuits. That is why they were successful.

We believe that efficiency is also neutral to our fee award. Class counsel has submitted well argued and well researched briefs on time. They have not wasted court or litigant resources with erroneous motions. Yet, MBUSA has pointed to several dead-end leads taken by counsel that may have unnecessarily increased costs. Dead-ends occur in all litigation as counsel strives to secure the best possible result for their client. We believe that the percentage-of-recovery award system already punishes and rewards class counsel for its efficiency or inefficiency. By awarding a percentage-of-recovery award, the class counsel has an incentive to work efficiently in the zealous pursuit of class's objectives. This factor is neutral to our inquiry because class counsel did not act so inefficiently as to necessitate adjustment.

### 4. The Complexity and Duration of the Litigation

This case went from filing to settlement in a relatively short time for a complex class action. This factor weighs in favor of a smaller percentage for the class counsel. By adjusting the fee downward when resolution occurs early, we help ensure that the class counsel adequately represents the best interest of the class. If the percentage remained the same for any settlement whether it was reached in one week, one year or one decade,

class counsel would have an incentive to settle early and reap quick rewards. This incentive would directly contradict Rule 23(a)'s adequacy requirement and the *Girsh* factor regarding the stage of proceedings and the amount of discovery completed. Rule 23(a) and *Girsh* help ensure the class counsel does not settle claims before knowing enough about the value of the class's claims. By awarding a smaller percentage in shorter cases and a larger percentage in more developed cases, the court can ensure that class counsel is rewarded for a more thorough crusade and punished for only a cursory inquiry before settlement. In this case, the parties agree that they are a long way from being prepared to try the case. Extensive discovery, interrogatories and depositions were left undone. At the same time, class counsel developed an impressive factual record through discovery and expert testimony in such a short time. We believe that this factor persuades us to lower the percentage, but not overly so in light of class counsel's efficient use of the short duration.

The litigation involved a complex jurisdictional issue. In all other respects, the litigation was routine. There were objections that needed to be addressed. This took time, but the issues involved in the objections were not difficult to handle.

The jurisdictional issue was the subject of discussion at the Settlement Hearing and the subsequent Oral Argument pursuant to our February 14th, 2003 Order. The parties were Ordered to brief the issue on a tight briefing schedule. Class counsel's activities on this thorny issue have not gone unnoticed. This weighs in favor of a higher percentage. On the other hand, the motion practice has been light. Briefing was especially light until the Settlement Hearing. Up to that point the only serious motions were a motion to remand, a motion to dismiss and a preliminary injunction motion. Nothing complex or unusual. This factor weighs against a high percentage award.

### 5. The Risk of Nonpayment

Any contingency fee includes a risk of nonpayment. That is why class counsel will be paid a percentage that is several times greater than an hourly fee in this case. This factor more properly addresses the concern that class counsel risks non-payment after securing class recovery because of the precarious financial position of the defendant. *See Gunter*, 223 F.3d at 199 (finding risk of non-payment to be high when "the defendants were close to insolvency"). MBUSA is financially stable and no one has questioned its ability to pay. This factor is not relevant in this case.

### 6. The Amount of Time Devoted to the Case by Plaintiffs' Counsel

Plaintiffs counsel devoted a considerable amount of their time to this case. This factor does not seem relevant to this case because of its relative simplicity to the megafund cases where class counsel must expand vast resources up front on staff time without the certainty of reimbursement. We will not accord this factor any weight. To do so would threaten the efficiency incentive that percentage of recovery awards grant. If we were to give this factor any weight in this relatively average class action, we would be encouraging unnecessary hourly billing practices. This was one of the main criticisms of the lodestar method that drove the courts back to the percentage fee award.

### 7. The Awards in Similar Cases

This is the most important and difficult factor in our inquiry. The parties have not cited, and we have not found, a comprehensive survey of percentage based class counsel fee awards in non-securities suits in for this Circuit published since the *Gunter* decision. Class counsel cites several securities class action cases which surveyed fee awards and concluded that attorneys are awarded around one-third of the fund. We do not believe that fees in highly complex and expensive securities cases are "similar cases" under the *Gunter* analysis.

Defense counsel attacks class counsel for relying on securities cases but goes on to direct us towards the Ninth Circuit's fee award review in *Vizcaino v. Microsoft*, 290 F.3d 1043, 1052–54 (2002) which surveys securities, antitrust and other cases in the $50 to $200 million dollar range. This survey is unhelpful because it is not a survey of similar cases.

Instead, we are guided by *Weiss*, 899 F.Supp. at 1303–04, and *Spark v. MBNA Corp.*, ·157 F.Supp.2d 330 (D.Del.2001). *Weiss* was a vehicle defect case brought against MBUSA. The court valued the voucher based settlement at seventy-five million and awarded a 15 percent fee. This was a pre-*Gunter* case and the court's reasoning is difficult to discern. *Spark* was a fraud claim based on defendant's misleading advertising. The court conduct a *Gunter* inquiry and set the percentage at 12.5% of the $5.8 million common fund. The court explained that the percentage was low for a common fund of such little value because the case was not complex and the class counsel was not particularly diligent. *Spark*, 157 F.Supp.2d at 346.

### 8. ·Fifteen Percent of the Common Fund's Value is Appropriate ·

We understand that securities litigation results in an average of one-third percentage award for attorney's fees. But this matter is of a much less complex basis. As a starting point, we would have awarded a twenty percent fee in an average non-securities and non-antitrust suit. We believe that the short duration and the simplicity of this case require a lower percentage. On the other hand, the complexity of the jurisdictional question leads us to slightly increase the percentage. We believe the *Weiss* case is extremely analogous because it involved a vehicle defect and similar warranty and statutory claims. The *Weiss* fund was also involved a difficult to value non-monetary common fund. We believe that fifteen percent takes into account the simplicity and speed of this litigation. This results in an award of $4,896,783.00.

### D. Lodestar Cross–Check

The Third Circuit recommends, but does not require, the lodestar cross-check. *See Gunter*, 223 F.3d at 199 ("In common fund cases, such as this one, we have suggested that it is advisable to cross-check the percentage award counsel asks for against the lodestar method of awarding fees so as to insure that plaintiffs' lawyers are not receiving an excessive fee at their clients' expense.").

Class counsel—excluding Arthur Miller—spent 3,883.20 hours on this litigation. At $425 per hour, the time was worth · $1,650,360.[45] *See* Third Supp. Aff. of Jacobsen filed on Mar. 19, 2003 [174–1].

MBUSA believes that the number of hours is excessive. It faults class counsel for not hiring low cost associates or paralegals. It · faults class counsel for billing hours that were spent solely in pursuit of attorney's fees. It faults class counsel for sending two attorneys to most of the depositions (but does not mention the fact that MBUSA's counsel did likewise). MBUSA claims that the lodestar should not include work by Peter Lennon because he never communicated with opposing counsel. We don't believe that lawyers should only be paid if they communicate with opposing counsel. We doubt that it is normal practice for every partner, paralegal or associate that worked on a matter to communicate directly with opposing counsel. MBUSA believes that class counsel reasonably worked 1,894 hours. It is these very types of billing disputes that lead to the demise of the lodestar method. This court is not a bean counter of attorney hours in Rule 23(b)(3) class actions. The lodestar cross-check is only meant to be a cursory overview. *See Gunter*, 223 F.3d at 200 (directing court to review time' summaries and not actual billing records).

MBUSA also challenges the reasonable hourly rate suggested by class counsel. It suggests a $350 rate. We do not believe an rate reduction is in order. MBUSA did not reference similar hourly rates in the local legal community or similar types of lawsuits. Instead, MBUSA's counsel compares it to the bulk discount hourly rates it charges MBUSA. MBUSA's ability to negotiate a discount on its legal bill is irrelevant to the hourly rate class counsel charges.

We believe that the billing rates favored by counsel are reasonable. We believe that the hours worked by counsel should be reduced by some unknown amount to remove

---

**45.** We realize that different attorneys billed at different rates on this matter. We are using $425 for simplicity. It is only slightly less then a weighted average of the actual billing rate.

hours worked solely in pursuit of the attorney's fees. However, without having ordered a detailed itemized bill, we cannot estimate this figure. Instead we will calculate two lodestar multipliers. We will assume an hourly rate of $425.

With a $4,896,783 fee award, the lodestar multiplier is 2.95 using class counsel's estimated reasonable hours and 6.08 using MBUSA's estimated reasonable hours. Neither figure seems unreasonable, and the actual multiplier is somewhere in between the two figures. It is less than the 7 to 10 multiplier range criticized in *In re Cendant,* 243 F.3d at 742. It is also much lower than the multiplier that would have resulted if we were to grant class counsel's seven million dollar fee request in full. Under this scenario, the class counsel and MBUSA's multipliers would have been 4.22 and 8.70 respectively. The Third Circuit has also recognized that multipliers in the range of one to four are frequently awarded in common fund cases. *In re Prudential,* 148 F.3d at 341. The lodestar multiplier does not evidence an unreasonably high or low fee award in this case.

### E. Costs and Expenses

Class counsel seeks reimbursement for $170,628.35 in out of pocket costs and expenses. MBUSA criticizes class counsel for not itemizing photocopying fees and billing expenses relating to unnecessary depositions. We agree that class counsel has not adequately documented the photocopying fee expenses because class counsel has not submitted a per-copy charge and has not submitted a reasonable estimate of the number of pages copied. Either figure would have allowed us to judge the reasonableness of the photocopying expense request. We do not agree that the depositions were unreasonably taken or that the accompanying expenses were excessive. We will award costs and expenses of $159,312.37. This number represents the fee request minus $11,315.98 in photocopying fees.

### VI. CONCLUSION

We have original subject matter jurisdiction over all class members' unjust enrichment and fraud claims pursuant to § 1332. We have original subject matter jurisdiction

pursuant to § 1332 over the state statutory claims when the requisite state statute allows for over $75,000 in treble damages. We have supplemental jurisdiction over the state statutory claims where the requisite state statute allows relief equal to or less than $75,000 pursuant to § 1367(a) because the claims are so related to the original jurisdiction claims.

We will certify this settlement only class because O'Keefe and the class counsel have meet the requirements of Rule 23(a). This settlement class is superior to other methods of adjudicating the claims and common issues predominate over individual issues. This settlement only class meets the requirements of Rule 23(b)(3).

The settlement is adequate, reasonable and fair. It was the produce of intense armslength negotiations. The absent class members were It passes the *Girsh* inquiry. We will approve the settlement. We will award class counsel $4,896,783 fee as reasonable and fair compensation for counsel's efforts. Costs and expenses awarded equal $159,312.37. An Order follows.

### ORDER

AND NOW, this 2nd day of April 2003, upon consideration of Joint Motion by Plaintiff Joseph A. O'Keefe and Defendant Mercedes–Benz, LLC for Approval of the Proposed Settlement filed on November 12, 2002 [97–1]; Plaintiff Counsel's Consolidated Petition for An Award of Attorney's Fees and Reimbursement of Out–of–Pocket Litigation Expenses filed on September 10, 2002 [67–1]; Defendant's Notice of Removal filed on March 7, 2003 [Civ. A. No. 03–1480 Docket # 1–1]; and the multiple briefs submitted by the parties and objectors, it is hereby **ORDERED** that consistent with the foregoing opinion as follows::

1. Civil Action Number 03–CV–1480 which was removed to this court on March 7, 2003 is **REMANDED** to Court of Common Pleas of Philadelphia County;

2. Pursuant to FED.R.CIV.P. 23(a) & 23(b)(3), a class consisting of all persons throughout the United States, including Puerto Rico and U.S. territories, who own or lease a model year 1998, 1999, 2000 or 2001

**312**

Mercedes–Benz vehicle equipped the FSS which was first purchased or leased before March 31, 2001 is **CERTIFIED** as a **SETTLEMENT ONLY CLASS;**

3. Pursuant to FED.R.CIV.P. 23(e), the July 15, 2002 Global Class Action Settlement Agreement [60–1], and the February 5, 2003 Addendum to Global Action Settlement Agreement [150–1 Ex: B] are **APPROVED AND CONFIRMED** as being fair, reasonable and adequate to all Class Members;

4. Joseph A. O'Keefe, Mercedes–Benz USA, LLC and their counsel are directed to implement the Global Class Action Settlement Agreement [60–1];

5. Mercedes–Benz USA, LLC is directed to pay Class Counsel $4,896,783.00 in attorney's fees and $159,312.37 in costs and expenses pursuant to the Global Class Action Settlement Agreement ¶ 20 [60–1]; and

6. Without affecting the finality of the Final Judgment, the Court **RETAINS** continuing jurisdiction over the Action and the Settling Parties. This case is closed.